UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| IN RE: BEMIS SECURITIES LITIGATION | 19 CIV. 3356 (PGG) |
|---|---|

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiff Michael Dixon ("Plaintiff"), by and through his undersigned counsel, for his Consolidated Amended Class Action Complaint against Defendants (defined below), alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of his counsel into the facts and circumstances alleged herein, which included, without limitation, review and analyses of: (i) U.S. Securities and Exchange Commission ("SEC") filings of Bemis Company, Inc. ("Bemis" or the "Company") and of Amcor Limited ("Amcor") through Amcor plc (f/k/a Arctic Jersey Limited) ("New Amcor"); (ii) press releases, public statements, analyst reports, conference call transcripts, news articles, and other publications disseminated by or concerning Bemis, Amcor or the Transaction (defined below); and (iii) other information concerning Defendants.

**INTRODUCTION**

1.      This is a class action brought on behalf of all Bemis stockholders entitled to vote on the proposal to adopt the Transaction Agreement (the "Transaction Agreement") between Bemis and Amcor and whose Bemis common stock was exchanged for 5.1 New Amcor shares (the "Merger Consideration") in connection with Bemis' merger with Amcor (the "Transaction"). This action is brought against Bemis and the members of its Board of Directors (the "Board" or the "Individual Defendants," collectively with Bemis, the "Defendants") arising out of the dissemination of a materially false and misleading Definitive Proxy Statement ("Proxy Statement"

or "Proxy") in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9.  Bemis stockholders approved the Transaction on May 2, 2019 ("Stockholder Vote"),  and the Transaction closed on June 11, 2019.

2.      Bemis makes flexible and rigid plastic packaging used by leading food, consumer products, healthcare, and other companies worldwide.  In 2017, Bemis launched a reorganization entitled "Agility," a three-pronged approach to fix, strengthen, and grow its business.  Bemis' results and own public statements demonstrated that the Company was headed for a turnaround. On July 26, 2018, Bemis announced its financial results for its second quarter ended June 30, 2018, including an approximately 70% increase in its earnings per share ("EPS") over the second quarter of 2017.  In the press release, Bemis' President and Chief Executive Officer ("CEO") defendant William F. Austen ("Austen") emphasized "Agility-related savings were approximately $9 million during the second quarter of 2018, for a year-to-date total of $17 million, reflecting a solid pace to meet the Company's full year 2018 savings plan."

3.      In late 2017, Starboard Value LP ("Starboard"), notorious for being an exceptionally aggressive activist investor, saw substantial value in Bemis.  Starboard was no stranger to the packaging industry, having run successful activist campaigns against packaging companies MeadWestvaco Corp. and Wausau Paper Corp., which ultimately resulted in their sales in 2015 and 2016, respectively.  Following a September 2017 unconfirmed report that Amcor was considering a Bemis acquisition, Starboard determined to make an Amcor-Bemis deal a certainty. In November 2018, Starboard issued its 13F filing for the 2017 third quarter, disclosing it had acquired 1.5 million Bemis shares.  Over the next several months Starboard continued to add Bemis shares, acquiring approximately 3.3% of Bemis' outstanding stock at a time when the

Company's shares were trading in the mid-to-high $40s per share.  Thereafter, Starboard executed

on its playbook.  After reaching a settlement to replace four directors in March 2018, Starboard

pushed the Company towards a sale despite Bemis' promising standalone prospects, and cashed

out before the Transaction closed.

4.     On August 6, 2018, Bemis and Amcor announced the Transaction.  Based on the

closing price of Amcor common stock of A$15.28 per share on August 3, 2018, the implied value

of the Merger Consideration was $57.75 per share.[1]  This was well below both the $60 per share

price projected by at least one analyst[2] and the $62.00 per-share midpoint of the all-important

*Illustrative Discounted Cash Flow Analysis* performed by Bemis' financial advisor Goldman

Sachs & Co. LLC ("Goldman") in opining on the fairness of the Transaction ("Bemis DCF").

5.     On March 27, 2019, Bemis filed the Proxy Statement with the SEC.  Despite a clear

legal mandate to disclose all material information regarding the Transaction in a truthful, non-

misleading manner, Defendants violated the Exchange Act by misrepresenting and omitting

material information in the Proxy Statement and Proxy Supplement.[3]  More specifically, the Proxy

Statement was materially misleading as to (i) the synergies projected to be achieved pursuant to

the Transaction, which were jointly developed by Bemis and Amcor management and defined in

---

[1] Proxy Statement at 90.  Even this per-share valuation may be overstated given the imprecision
of valuing shares that trade on foreign exchanges such as the Australian Securities Exchange, the
exchange on which Amcor traded prior to the Transaction.  For example, Defendants' calculation
of the value of the Transaction is based upon an Australian dollar/US dollar exchange rate of 0.74,
which implies an Amcor closing price of $11.30 on August 3, 2018.  Yahoo Finance reports
Amcor's closing price on August 3, 2018 was $11.10, and thus an implied valuation of $56.61 per
share.  Plaintiff reserves the right to challenge the purported valuation of the Merger Consideration
on this basis.

[2]     https://nypost.com/2017/12/04/packaging-giant-bemis-hires-goldman-sachs-to-explore-sale-
options/

[3] The Defendants supplemented the Proxy Statement with additional information on April 25, 2019
(the "Proxy Supplement").

the Proxy as "Net Synergies;"[45] (ii) Defendants' good-faith opinions and beliefs concerning the projected Net Synergies; and (iii) potential conflicts of interests faced by Goldman, Bemis' financial advisor.

6.      With respect to projected synergies, the value of Net Synergies became the crucial selling point employed in the Proxy to convince Bemis stockholders of the fairness of the deal given the overwhelming success of Agility, the standalone valuations calculated by Goldman in the Bemis DCF, and the market's bullish outlook on the future prospects of the Company.  If Bemis stockholders were being asked to give up ownership in a company that, on a standalone basis, had a greater intrinsic value than the current value of what they were receiving back, then hyping the added value of combining the two entities became the best way to accomplish that goal.

7.      To that end, the "Background of the Transaction" section of the Proxy Statement sets forth the estimated per share value of pre-tax run-rate synergies with respect to Amcor's various bids and proposals.  Specifically:

(a)      with respect to Amcor's March 23, 2018 proposal, the Proxy Statement sets forth on page 80:

> Amcor's proposal also estimated that the combined company would realize $160 million to $200 million of pre-tax run-rate synergies per year, which, if realized, would deliver approximately $6.00 per Bemis Share in additional value to former Bemis shareholders after the transaction was consummated, resulting in a total per-share implied valuation for Bemis of approximately $58.00 per Bemis Share[;]

---

[4] The Proxy Statement defines Net Synergies as "certain operating synergies projected to result from the transaction…based upon a range of potential operating synergies jointly developed by the management of Amcor and Bemis and approved for Goldman's use by Bemis.  Proxy Statement at 103.

[5] The Proxy Statement includes four sets of projected financial information critical to understanding the future prospects of Bemis as a standalone entity, the prospects of the combined entity New Amcor, and ultimately the fairness if the Transaction: (i) the Bemis Forecasts; (ii) Bemis' Adjusted Amcor Forecasts; (iii) the Pro Forma Forecasts, and (iv) the Net Synergies.  *Id.* at 102-108.

(b)        with respect to Amcor's June 5, 2018 proposal, the Proxy Statement sets

forth on page 82:

> Amcor's proposal also assumed that the combined company would realize at least
> $200 million of pre-tax run-rate net cost synergies per year, which, if realized,
> would deliver over $7.00 per Bemis Share in additional value to former Bemis
> shareholders after the transaction is consummated, resulting in a total per-share
> implied valuation for Bemis of approximately $60.00[; and]

(c)        with respect to Amcor's June 20, 2018 proposal, the Proxy Statement sets

forth on page 83:

> Amcor's proposal also continued to assume that the combined company would
> realize at least $200 million of pre-tax run-rate net cost synergies per year, which,
> if realized, would deliver over $7.00 per Bemis Share in additional value to former
> Bemis shareholders after the transaction is consummated, resulting in a total per-
> share implied valuation for Bemis of approximately $61.00

Prominently featuring the self-serving synergy valuations embedded in Amcor's bids in the

background section of the Proxy Statement was an obvious effort to influence and condition Bemis

stockholders to the idea that future synergies will make the Transaction worthwhile.

8.        On June 22, 2018, the Bemis Board agreed to move forward with the Transaction

on the terms outlined in Amcor's June 20 proposal. *Id.* at 83.  Yet the Board did not get around to

initially evaluating the proposed synergies that Amcor had been touting in each of their bids until

July 6, 2018, two full weeks after agreeing to Amcor's terms. *Id.* at 84.  The Board waited nearly

another month to undertake what was arguably a full analysis of the synergies, when a third-party

consultant *engaged by Amcor* walked the Board through "the nature and magnitude of the

estimated synergies." *Id.* at 87.

9.        While the Proxy Statement discloses projected Net Synergies for 2019-2021[6] and

---

[6] $(17) million for FY 2019, $76 million for FY 2020, and $200 million for FY 2021. *Id.* at 107
and 108

that they were "jointly developed by the management of Amcor and Bemis," it is silent to the most important facts concerning their basis and formulation.  In this regard, the Proxy Statement misleadingly fails to disclose: (i) the assumptions and methodologies underlying the projected Net Synergies; (ii) the specific role, if any, played by Bemis management, Defendants, or Bemis' financial advisor Goldman in the development and calculation of the projected Net Synergies; (iii) the identity and role played by Amcor's "third-party" consultant in the development and calculation of the projected Net Synergies.  Given the importance of the Net Synergies in the evaluation of the fairness of the Transaction, the omitted information was vital to Bemis stockholders to permit a fully-informed Stockholder Vote, and renders the Proxy false and misleading.

10.    Perhaps more importantly, what is disclosed in the Proxy strongly suggests Defendants and their financial advisor Goldman capitulated to Amcor's self-serving estimates of the projected value of the Net Synergies as a painless way to make the Transaction more appealing to stockholders and secure the valuable benefits that accompanied the deal.  It is more than a coincidence the 2021 projected Net Synergies "developed jointly" by Bemis and Amcor management are identical to the net cost synergies touted in the three Amcor proposals, and valued at $6.00 - $7.00 per share.  After all, Bemis management and Board did not even begin considering the value of those synergies until July (after agreeing to Amcor's June 20, 2018 terms), and finalized them for provision to Goldman after the August 1 presentation from Amcor's "third-party consultant."  While the Proxy provides a timeframe for the evolution of Bemis' stand-alone projections (defined in the Proxy as the "Bemis Forecasts")[7], the only context attributed to the "other Forecasts" (including projected Net Synergies) was they were "subsequently developed in

---

[7] *Id.* at 103.

connection with the [t]transaction." *Id.* at 103.

11.     As such, the circumstances and timing surrounding the creation of the projected Net Synergies renders the statements included in the Proxy concerning Defendants' belief in the value of the projections in general, and the projected Net Synergies in particular, false and misleading.  More specifically, the Proxy's representation that the projected Net Synergies "had been reasonably prepared on a basis reflecting the best currently available estimates and judgements of management of Bemis" is materially false and misleading because the Net Synergies reflect Amcor's, not Defendants', estimates and judgements. *Id.* at 95.  Similarly, Defendants' stated belief that Bemis' shareholders will "…benefit from the net cost synergies expected to result from the transaction, which are projected to be at least $180 million annually (on a pre-tax basis) by the end of New Amcor's third fiscal year . . . ." is rendered false and misleading for identical reasons. *Id.* at 90.

12.     The Proxy Statement's lack of transparency concerning synergies appears to be coming home to roost.  A March 10, 2020 report by Spruce Point Capital Management ("Spruce Point") highlights that Amcor and Bemis told an "organic" EPS growth story through suspect cost synergies.[8]  According to Spruce Point, "Amcor claims $180m of Bemis deal cost synergies and avoids discussion of sales synergies. Based on our analysis, deal costs are rising faster than planned, and sales are vanishing."   Spruce Report at 2.   The Spruce Report continues by questioning Amcor's recent guidance on cost synergies related to the Transaction, calling it "dubious in light of evidence [Research and Development] spending is running $35mm below plan," concluding "Amcor was adamant at the deal announcement that cost synergies would not

---

[8] *What Investors are Missing With the Amcor and Bemis $6.8bn Merger and Why Significant Downside Risks Exist*, https://www.sprucepointcap.com/amcor-plc/ (the "Spruce Report").

include [Research and Development] cuts." *Id.*

13. In addition, the Proxy Statement failed to disclose material information concerning potential conflicts of interest faced by Goldman, the Board's financial advisor. According to the Proxy Statement, the Board's decision to approve the Transaction was supported by Goldman's opinion to the Board "to the effect that as of August 6, 2018 and based upon and subject to the factors and assumptions set forth in its opinion, the exchange ratio in the merger pursuant to the Transaction Agreement was fair from a financial point of view" to Bemis stockholders. Proxy Statement at 89-91. However, Goldman was incentivized to render, as it did, a favorable fairness opinion that the Merger Consideration was fair to Bemis' stockholders in order to secure additional business in connection with divestitures necessary to secure regulatory approval for the Transaction. The initial draft of the Transaction Agreement Amcor's counsel sent to Bemis' counsel on July 13, 2018 contemplated a cap on potential divestitures. *Id.* at 84. Antitrust-related undertakings were a point of discussion for Amcor's and Bemis' counsel on July 23, 2018 and antitrust covenants were discussed by the Board at its July 24, 2018 Board meeting, at which Goldman was present. *Id.* at 85. Two days later, Goldman and Bemis entered into an engagement letter, which contemplated Goldman's role in any divestitures. *Id.* at 86. The Proxy Statement sets forth that:

> in connection with obtaining regulatory approval for the transaction, Amcor and/or Bemis may be required to divest one or more of their respective businesses. As approved by Bemis, Goldman Sachs' Merchant Banking Division, or funds, investment vehicles or other entities managed, sponsored or advised by Goldman Sachs' Merchant Banking Division or in which it may have economic interests may participate in any sale process with respect to such businesses, including potentially bidding on and purchasing one or more of such businesses.

*Id.* at 102.

14. The Proxy Statement failed, however, to disclose: (i) when Bemis approved

Goldman's Merchant Banking Division, or funds, investment vehicles or other entities managed, sponsored or advised by Goldman's Merchant Banking Division or in which it may have economic interests, participating in any sale process with respect to the businesses that Amcor and/or Bemis might be required to divest in connection with obtaining regulatory approval for the Proposed Transaction, including potentially bidding on and purchasing one or more of such businesses; and (ii) the specific content and nature of the discussions Goldman had with Bemis regarding its potential participation in any sale process with respect to businesses Amcor and/or Bemis might be required to divest, including with respect to potentially bidding on and purchasing one or more of such businesses. Unsurprisingly, the European Commission required Bemis to divest three plants located in the United Kingdom and Ireland in order to attain regulatory approval.[9] Similarly, the U.S. Department of Justice required Amcor to divest three manufacturing facilities located in Ashland, Massachusetts; Milwaukee, Wisconsin; and Madison, Wisconsin; along with certain related assets, to complete the Transaction.[10] As a result of the omission of the details of the timing and nature of negotiations concerning the terms of Goldman's engagement letter with respect to its participation in any divestitures, the Individual Defendants misled Bemis stockholders by providing an incomplete picture of the full extent of Goldman's conflicts and the role the Board had in incentivizing Goldman to opine on the fairness of the Transaction. This material information was necessary for Bemis stockholders to fully understand the arrangements that Goldman was operating under in order to determine whether there were conflicts that called into question the independence of Goldman and/or the adequacy of its fairness opinion as a whole and

---

[9] https://www.amcor.com/media/news/european-commission-approval-received-for-amcor-and-bemis-transaction

[10] https://www.justice.gov/opa/pr/justice-department-requires-amcor-divest-medical-flexible-packaging-assets-order-proceed

Goldman's and the Board's attempt to make the undervalued Transaction appear fair.

15.     As a result of the materially misleading Proxy Statement, to the benefit of Starwood and Bemis insiders, Bemis' uninformed stockholders voted in favor of the Transaction on May 2, 2019.  A majority of Bemis' stockholders voted to approve the Transaction, and the Transaction closed on June 11, 2019.  The materially false and misleading Proxy was an essential link in the consummation of the Transaction, as the Stockholder Vote and resulting Transaction could not have occurred without the dissemination of the Proxy Statement.

16.     This action seeks damages on behalf of Bemis' stockholders, incurred as a result of the Defendants' materially misleading Proxy Statement disseminated in contravention of Sections 14(a) and 20(a) of the Exchange Act.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

18.     The Court has jurisdiction over Defendants because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants are found or are inhabitants or transact business in this District.  Bemis' common stock traded on the New York Stock Exchange, and the combined company's common stock trades on the New York Stock Exchange, which is headquartered in this District, rendering venue in this District appropriate.

## PARTIES

20.     Plaintiff was at all times relevant hereto, a continuous stockholder of Bemis.

21.     Before the Transaction, Bemis, a Missouri corporation, was a supplier of flexible and rigid plastic packaging used by leading food, consumer products, healthcare, and other companies worldwide.  Headquartered in Neenah, Wisconsin, Bemis employed approximately 16,000 individuals worldwide.  The Company's common stock traded on the New York Stock Exchange under the ticker symbol "BMS."

22.     Defendant Austen served as President, CEO and a director of Bemis from 2014 through the completion of the Transaction.

23.     Defendant Katherine C. Doyle ("Doyle") served as a director of the Company from 2017 through the completion of the Transaction.

24.     Defendant Adele M. Gulfo ("Gulfo") served as a director of the Company from 2015 through the completion of the Transaction.

25.     Defendant David S. Haffner ("Haffner") served as a director of the Company from 2004 through the completion of the Transaction.

26.     Defendant Timothy M. Manganello ("Manganello") served as Chairman of the Board and a director of the Company from 2004 through the completion of the Transaction.

27.     Defendant Arun Nayar ("Nayar") served as a director of the Company from 2015 through the completion of the Transaction.

28.     Defendant Guillermo Novo ("Novo") served as a director of the Company from 2018 through the completion of the Transaction.  Defendant Novo was appointed to the Board pursuant to Starboard's March 16, 2018 agreement with the Company.

29.     Defendant Marran H. Ogilvie ("Ogilvie") served as a director of the Company from

2018 through the completion of the Transaction.  Defendant Ogilvie was appointed to the Board pursuant to Starboard's March 16, 2018 agreement with the Company.

30.     Defendant David T. Szczupak ("Szczupak") served as a director of the Company from 2012 through the completion of the Transaction.

31.     Defendant Holly A. Van Deursen ("Van Deursen") served as a director of the Company from 2008 through the completion of the Transaction.

32.     Defendant Philip G. Weaver ("Weaver") served as a director of the Company from 2005 through the completion of the Transaction.

33.     Defendant George W. Wurtz III ("Wurtz") served as a director of the Company from 2018 through the completion of the Transaction.  Defendant Wurtz was appointed to the Board pursuant to Starboard's March 16, 2018 agreement with the Company.

34.     Defendant Robert H. Yanker ("Yanker") served as a director of the Company from 2018 through the completion of the Transaction.  Defendant Yanker was appointed to the Board pursuant to Starboard's March 16, 2018 agreement with the Company.

35.     Defendants referenced in paragraphs 22 to 34 are collectively referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

36.     Before the Transaction, Amcor, an Australian company, was a global leader in responsible packaging solutions, supplying a broad range of rigid and flexible packaging products into the food, beverage, healthcare, personal care and other fast moving consumer end markets. Amcor operates around 195 sites in over 40 countries, with approximately 35,000 employees.  For the year ended 30 June 2017, Amcor generated revenues of US$9.1 billion and EBITDA of US$1.4 billion.  Amcor's stock traded on the Australian Securities Exchange under the ticker symbol

"AMC."

37.      New Amcor is a limited company incorporated under the Laws of the Bailiwick of Jersey.  On October 10, 2018, New Amcor was renamed "Amcor plc" and became a public limited company incorporated under the Laws of the Bailiwick of Jersey.  Following the completion of the Transaction, New Amcor's stock trades on the New York Stock Exchange under the ticker symbol "AMCR."

38.      Arctic Corp. was a Missouri corporation and a wholly-owned subsidiary of New Amcor.

## CLASS ACTION ALLEGATIONS

39.      Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that owned Bemis common stock (the "Class").  Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

40.      Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

41.      The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of March 20, 2019, there were approximately 91,211,989 shares of Bemis common stock issued and outstanding.  All members of the Class may be identified from records maintained by Bemis or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

42.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)     Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)     Whether Plaintiff and the other members of the Class have been damaged and the proper measure of damages.

43.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.  Plaintiff has retained competent counsel experienced in litigation of this nature.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

45.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Company Background

46.     Bemis was founded in 1858 as a manufacturer of printed cotton bags for food products.  Bemis was incorporated in 1885 as Bemis Bro. Bag Company with the name changed to Bemis Company, Inc. in 1965.  Bemis was a global manufacturer of flexible and rigid packaging products.  The majority of Bemis' products were sold to customers in the food industry.  Other

14

customers included companies in the following types of businesses: chemical, agribusiness, medical, pharmaceutical, personal care, electronics, industrial, and other consumer goods. As of December 31, 2017, Bemis had approximately 16,500 employees worldwide.

47.     Bemis' business activities were organized around three reportable business segments: (1) U.S. Packaging (65% of 2017 net sales), (2) Latin America Packaging (18% of 2017 net sales) and (3) Rest of World Packaging (17% of 2017 net sales).

48.     The U.S. Packaging segment represented all food, consumer, and industrial products packaging-related manufacturing operations located in the United States. This segment manufactured multilayer polymer, blown and cast film structures which are then converted to produce packaging for processed and fresh meat, dairy, liquids, frozen foods, cereals, snacks, cheese, coffee, condiments, candy, pet food, bakery, lawn and garden, tissue, fresh produce, personal care and hygiene, disposable diapers, and agribusiness.

49.     The Latin America Packaging segment included all food and non-food packaging-related manufacturing operations located in Latin America. This segment manufactured multilayer polymer, blown and cast film structures to produce packaging sold for a variety of food, medical, pharmaceutical, personal care, electronics, and industrial applications. Additional products included injection molded and thermoformed plastic as well as folding carton packaging. These packaging solutions were used for a variety of applications including processed and fresh meat, dairy, liquids, snacks, cheese, coffee, condiments, candy, bakery, tissue, fresh produce, personal care and hygiene, disposable diapers, pet food, pharmaceutical, and medical devices.

50.     The Rest of World Packaging segment included all food and non-food packaging-related manufacturing operations located in Europe and Asia-Pacific as well as medical device and pharmaceutical packaging-related manufacturing in the U.S., Europe, and Asia. This

segment manufactured multilayer polymer, blown and cast film structures to produce packaging sold for a variety of food, medical, pharmaceutical, personal care, electronics, and industrial applications. These applications included processed and fresh meat, dairy, liquids, snacks, cheese, coffee, condiments, candy, bakery, tissue, fresh produce, personal care and hygiene, pharmaceutical, and medical devices.

51.    During 2017, Bemis launched Agility, its three-pronged approach to fix, strengthen, and grow its business.

52.    On July 26, 2018, Bemis issued a press release announcing its financial results for its second quarter ended June 30, 2018. For the quarter, the Company reported a significant improvement in earnings, including an approximately 70% increase in its EPS over the second quarter of 2018. Bemis further reported an increase in its adjusted EPS, cash from operations, U.S. Packaging operating profit, Latin America Packaging operating profit and Rest of World Packaging operating profit, as set forth in the following table:

| ($ in millions except per share amounts) | Q2 | | | Q2 YTD | | |
|---|---|---|---|---|---|---|
| | 2018 | 2017 | change | 2018 | 2017 | change |
| Earnings Per Share | $ 0.51 | $ 0.30 | 70.0 % | $ 1.03 | $ 0.85 | 21.2 % |
| Adjusted Earnings Per Share | $0.68 | $0.48 | 41.7 % | $ 1.31 | $ 1.06 | 23.6 % |
| | | | | | | |
| U.S. Packaging Operating Profit | $89.9 | $ 80.1 | $ 9.8 | $177.1 | $163.6 | $ 13.5 |
| Latin America Packaging Operating Profit | $ 9.0 | $ 2.9 | $ 6.1 | $ 17.0 | $ 16.5 | $ 0.5 |
| Rest of World Packaging Operating Profit | $ 18.7 | $ 14.8 | $ 3.9 | $ 35.2 | $ 28.4 | $ 6.8 |

53.    Defendant Austen commented on the quarter, stating:

We delivered strong earnings this quarter and continued to make progress on Agility, which is our plan to fix, strengthen, and grow our business . . . . Operating profit increased $20 million compared to last year, with strong improvement in all of our business segments. In our U.S. business, operating profit increased nearly $10 million as a result of the benefits of Agility and strong operations within our factories. In our Latin America business, despite currency translation headwinds, operating profit increased $6 million due to continued variable and fixed cost improvements made in light of the challenging economic environment in Brazil.

Our teams in Brazil also did an excellent job mitigating the impact from the nationwide trucker strike during the quarter. And in our Rest of World business, operating profit increased nearly $4 million driven by strong organic sales growth of healthcare packaging.

. . . We delivered a solid first half in 2018, increasing adjusted earnings per share by $.25 over the prior year. Our teams across the globe are committed to improving our business for the long-term.

54.    In the press release, the Company also provided an update on Agility, noting that "Agility-related savings were approximately $9 million during the second quarter of 2018, for a year-to-date total of $17 million, reflecting a solid pace to meet the Company's full year 2018 savings plan."

**The Process Leading to the Transaction**

55.    On September 7, 2017, certain media outlets published unconfirmed reports that Amcor was considering a potential acquisition of Bemis.  Shortly thereafter, Starboard began acquiring Bemis shares.  In November 2018, Starboard issued its 13F filing for the 2017 third quarter, disclosing it had acquired 1.5 million Bemis shares.  Over the next several months Starboard continued to add Bemis shares, acquiring approximately 3.3% of Bemis' outstanding stock.

56.    During the second half of 2017, Bemis held discussions with each of Amcor, and strategic parties referred to in the Proxy Statement as "Party A" and "Party B" regarding a potential transaction.

57.    On March 16, 2018, Bemis and Starboard announced they had reached a settlement, pursuant to which Defendants Novo, Ogilvie, Wurtz and Yanker were appointed to the Board.

58.    On March 23, 2018, Amcor submitted a confidential letter to the Board containing a proposal to acquire Bemis in which Bemis stockholders would own approximately 28% of the combined company based on a fixed exchange ratio of 4.8 Amcor shares for each Bemis share,

implying a valuation of $52.00 per Bemis share. Amcor's proposal also estimated that the combined company could achieve synergies, which, if realized, would deliver approximately $6.00 per Bemis share in additional value to former Bemis stockholders after the transaction was consummated.

59.     In May 2018, Bemis held discussions with a strategic party referred to in the Proxy Statement as "Party C" and a private investment company referred to in the Proxy Statement as "Party D." Throughout June 2018, Party C reiterated its interest in a potential combination with Bemis and its belief that if Party C and Bemis entered into a confidentiality agreement, Party C would be in a position to make a merger or acquisition proposal to Bemis.

60.     On June 5, 2018, Amcor submitted a confidential letter to the Board containing a revised proposal to combine Bemis and Amcor at a fixed exchange ratio of 5.0 Amcor shares per Bemis share, with Bemis stockholders owning approximately 28.4% of the combined company. Including the value of potential synergies, the revised proposal had an implied value of approximately $60.00 per Bemis share.

61.     On June 8, 2018, Bemis and Party D entered into a confidentiality agreement.

62.     On June 20, 2018, Amcor submitted a revised proposal to acquire Bemis at a fixed exchange ratio of 5.1 Amcor shares per Bemis share. The proposal also assumed that the combined company would realize synergies resulting in an additional $7.00 per Bemis share.

63.     Throughout July and the first week of August 2018, the parties and their advisors negotiated the terms of the Proposed Transaction and Transaction Agreement.

64.     At an August 6, 2018 Board meeting, Goldman rendered its fairness opinion and the Board approved the Transaction Agreement. The parties subsequently executed the Transaction Agreement.

## The Transaction

65.     On August 6, 2018, Amcor and Bemis issued a joint press release announcing the

Transaction.  The press release stated, in relevant part:

> MELBOURNE, AUSTRALIA and NEENAH, WISCONSIN — Amcor Limited (ASX: AMC) and Bemis Company, Inc. (NYSE: BMS) today announced that their respective Boards of Directors have unanimously approved a definitive agreement under which Amcor will acquire Bemis in an all-stock combination. Combining these two complementary companies will create the global leader in consumer packaging, with the footprint, scale and capabilities to drive significant value for shareholders, offer customers and employees the most compelling value proposition in the packaging industry and deliver the most sustainable innovations for the environment.
>
> The transaction will be effected at a fixed exchange ratio of 5.1 Amcor shares for each Bemis share, resulting in Amcor and Bemis shareholders owning approximately 71% and 29% of the combined company, respectively. This is equivalent to a transaction price of US$57.75 per Bemis share based on Amcor's closing share price of A$15.28(4) on August 3, 2018, and represents a premium of 25% to Bemis' closing price of US$46.31 per share as of August 2, 2018(5).
>
> Amcor's CEO, Ron Delia, said: "The strategic rationale for this combination and the financial benefits are highly compelling for both Amcor and Bemis shareholders. We are convinced this is the right deal at the right time for both companies, and with the right structure for both sets of shareholders to participate in a unique value creation opportunity. Amcor identified flexible packaging in the Americas as a key growth priority and this transaction delivers a step change in that region.
>
> "There are an increasing number of opportunities arising for a leading packaging company to capitalize on shifting consumer needs, an evolving customer landscape and the need to provide responsible packaging solutions that protect the environment. With this transaction, Amcor will have a stronger value proposition with the scale, breadth and resources to unlock value from these opportunities, for the benefit of our shareholders, customers and employees."
>
> "Amcor's financial profile will be enhanced, and our existing capital allocation framework, or shareholder value creation model, will be maintained and strengthened with this transaction. The combined company expects to have an investment grade balance sheet that provides immediate capacity for further disciplined investment as well as a compelling, progressive dividend. Amcor will draw on our extensive merger integration experience to deliver the substantial benefits of this combination."

Bemis' President and CEO, William F. Austen, said: "The combination of Bemis and Amcor is transformational, bringing together two highly complementary organizations to create a global leader in consumer packaging. We believe this combination, which is an exciting growth story for both companies, will benefit all stakeholders. Our employees will benefit as part of a larger and more global organization focused on a commitment to customer service, integrity and supporting strong teams. In addition, the combination will enable us to offer global, regional and local customers the most compelling value proposition in the industry through a broader product portfolio, increased product differentiation and enhanced operating capabilities, while leveraging Bemis' extensive U.S. manufacturing base and strengths in material science and innovation. Our shareholders will receive a significant premium in this transaction, reflecting the value we've built as an organization, as well as the opportunity to continue to participate in the upside potential of a more diversified combined company with greater scale and resources. We look forward to working together with Amcor to ensure a seamless integration."

Amcor's CEO, Ron Delia, concluded, "Amcor and Bemis have many things in common starting with proud histories that date back more than 150 years. Both companies are grounded in strong values, a shared commitment to innovation and value-added consumer packaging, and have talented management teams."

"We have always had a great deal of respect for Bemis and we are thrilled that its team in Wisconsin and around the world will be joining Amcor. Many people at Amcor today have joined us through acquisitions, including many of our leadership team, and we would expect Bemis to be well represented in Amcor at all levels of the organization."

## The Conflicted Defendants and Bemis Management Each Had Personal Financial Reasons for Supporting the Unfair Transaction

66.     Bemis' directors and management faced personal conflicts of interest that motivated them to support the Transaction.

67.     Pursuant to the Bemis Incentive Plan, all outstanding and unvested Bemis equity awards would vest (with Bemis performance stock units vesting assuming target level of performance has been achieved) as of the effective time. The following table sets forth the aggregate consideration that each named executive officer would receive in connection with their Bemis equity awards that were subject to accelerated vesting in connection with the Proposed Transaction:

| | Shares Subject to Unvested RSUs (#) | Total Value of Shares Subject to Unvested RSUs (USD) | Shares Subject to Unvested PSUs (#) | Total Value of Shares Subject to Unvested PSUs (USD) | Total (USD) |
|---|---|---|---|---|---|
| William F. Austen | 27,132 | 1,394,572 | 150,730 | 7,783,395 | 9,177,967 |
| Michael B. Clauer | 6,064 | 311,711 | 33,690 | 1,739,684 | 2,051,395 |
| Sheri H. Edison | 3,529 | 181,382 | 19,604 | 1,012,311 | 1,193,693 |
| Timothy S. Fliss | 2,431 | 124,953 | 13,506 | 697,423 | 822,376 |
| Fred Stephan | 10,599 | 546,177 | 24,729 | 1,274,310 | 1,820,487 |

68.     In addition, if they were terminated in connection with the Proposed Transaction, Bemis' named executive officers would receive substantial cash severance payments, as set forth in the following table:

| (in USD) | Cash(1) | Equity(2) | Benefits(3) | Total(4) |
|---|---|---|---|---|
| William F. Austen | 28,669,266 | 9,177,967 | 160,462 | 38,007,695 |
| Michael B. Clauer | 1,396,616 | 2,051,395 | 71,923 | 3,519,934 |
| Sheri H. Edison | 2,943,189 | 1,193,693 | 97,376 | 4,234,258 |
| Timothy S. Fliss | 2,325,842 | 822,376 | 79,582 | 3,227,800 |
| Fred Stephan | 540,959 | 1,820,487 | — | 2,361,446 |

69.     Moreover, each Bemis executive officer other than defendant Austen and Bemis' Chief Financial Officer Michael Clauer ("Clauer") received a retention bonus award that will vest and be paid on the one-year anniversary of the closing, subject to the executive officer's continued employment through such date, or such earlier termination of the executive officer's employment by Bemis other than for misconduct or non-performance.

70.     Finally, certain Company insiders secured positions for themselves with the combined company.   For example, defendant Austen and Clauer entered into consulting arrangements with Amcor (for initial periods of 6-months and 3-months, respectively) pursuant to which they would provide transition services, as requested by Amcor.

**The False and Misleading Proxy Statement**

71.     On March 27, Defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to Bemis' stockholders.  The Proxy Statement, which recommended that Bemis' stockholders vote in favor of the Transaction and was an essential link

in the accomplishment of the Transaction, omitted and/or misrepresented material information that was necessary for the Company's stockholders to make an informed voting decision in connection with the Transaction.

72.     Specifically, as set forth below, the Proxy Statement omitted and/or misrepresented material information in contravention of §§ 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder concerning: (i) circumstances surrounding development and creation of the projected Net Synergies; (ii) Defendants' good-faith opinions and beliefs concerning the projected Net Synergies; and (iii) potential conflicts of interests faced by Goldman, Bemis' financial advisor.

**_Material Omissions Concerning the Projected Synergies_**

73.     With respect to projected synergies, the value of Net Synergies became the crucial selling point employed in the Proxy to convince Bemis stockholders of the fairness of the deal given the overwhelming success of Agility, the standalone valuations calculated by Goldman in the Bemis DCF, and the market's bullish outlook on the future prospects of the Company.  If Bemis stockholders were being asked to give up ownership in a company that, on a standalone basis, had a greater intrinsic value than the current value of what they were receiving back, then hyping the added value of combining the two entities became the best way to accomplish that goal.

74.     To that end, the "Background of the Transaction" section of the Proxy Statement sets forth the estimated per share value of pre-tax run-rate synergies with respect to Amcor's various bids and proposals.  Specifically:

(a)     with respect to Amcor's March 23, 2018 proposal, the Proxy Statement sets forth on page 80:

> Amcor's proposal also estimated that the combined company would realize $160 million to $200 million of pre-tax run-rate synergies per year, which, if realized,

would deliver approximately $6.00 per Bemis Share in additional value to former Bemis shareholders after the transaction was consummated, resulting in a total per-share implied valuation for Bemis of approximately $58.00 per Bemis Share[;]

(b)    with respect to Amcor's June 5, 2018 proposal, the Proxy Statement sets forth on page 82:

Amcor's proposal also assumed that the combined company would realize at least $200 million of pre-tax run-rate net cost synergies per year, which, if realized, would deliver over $7.00 per Bemis Share in additional value to former Bemis shareholders after the transaction is consummated, resulting in a total per-share implied valuation for Bemis of approximately $60.00[; and]

(c)    with respect to Amcor's June 20, 2018 proposal, the Proxy Statement sets forth on page 83:

Amcor's proposal also continued to assume that the combined company would realize at least $200 million of pre-tax run-rate net cost synergies per year, which, if realized, would deliver over $7.00 per Bemis Share in additional value to former Bemis shareholders after the transaction is consummated, resulting in a total per-share implied valuation for Bemis of approximately $61.00.

Prominently featuring the self-serving synergy valuations embedded in Amcor's bids in the background section of the Proxy Statement was an obvious effort to influence and condition Bemis stockholders to the idea that future synergies will make the Transaction worthwhile.

75.    On June 22, 2018, the Bemis Board agreed to move forward with the Transaction on the terms outlined in Amcor's June 20 proposal.  Proxy Statement at 83.  Yet the Board did not get around to initially evaluating the proposed synergies that Amcor had been touting in each of their bids until July 6, 2018, two full weeks after agreeing to agreeing to Amcor's terms. *Id.* at 84. The Board waited nearly another month to undertake what was arguably a full analysis of the synergies, when a third-party consultant *engaged by Amcor* walked the Board through "the nature and magnitude of the estimated synergies."  *Id.* at 87.

76.     While the Proxy Statement discloses projected Net Synergies for 2019-2021[11] and that they were "jointly developed by the management of Amcor and Bemis," it is silent to the most important facts concerning their basis and formulation.  In this regard, the Proxy Statement misleadingly fails to disclose: (i) the assumptions and methodologies underlying the projected Net Synergies; (ii) the specific role, if any, played by Bemis management, Defendants, or Bemis' financial advisor Goldman in the development and calculation of the projected Net Synergies; (iii) the identity and role played by Amcor's "third-party" consultant in the development and calculation of the projected Net Synergies.  Given the importance of the Net Synergies in the evaluation of the fairness of the Transaction, the omitted information was vital to Amcor stockholders to permit a fully-informed Stockholder Vote, and renders the Proxy false and misleading.

77.     Perhaps more importantly, what is disclosed in the Proxy strongly suggests Defendants and their financial advisor Goldman capitulated to Amcor's self-serving estimates of the projected value of the Net Synergies as a painless way to make the Transaction more appealing to stockholders and secure the valuable benefits that accompanied the deal.  It is more than a coincidence the 2021 projected Net Synergies "developed jointly" by Bemis and Amcor management are identical to the net cost synergies touted in the three Amcor proposals, and valued at $6.00 - $7.00 per share.  After all, Bemis management and Board did not even begin considering the value of those synergies until July (after agreeing to Amcor's June 20, 2018 terms), and finalized them for provision to Goldman after the August 1 presentation from Amcor's "third-party consultant."  While the Proxy provides a timeframe for the evolution of the Bemis Forecasts[12], the

---

[11] $(17) million for FY 2019, $76 million for FY 2020, and $200 million for FY 2021.  Proxy Statement at 107 and 108.

[12] *Id.* at 103

only context attributed to the "other Forecasts" (including projected Net Synergies) was they were "subsequently developed in connection with the [t]transaction." *Id.* at 103.

78.     Such, the circumstances and timing surrounding the creation of the projected Net Synergies renders the statements included in the Proxy concerning Defendants' belief in the value of the projections in general, and the projected Net Synergies in particular, false and misleading. More specifically, the Proxy's representation that the projected Net Synergies "had been reasonably prepared on a basis reflecting the best currently available estimates and judgements of management of Bemis" is materially false and misleading in because the Net Synergies reflect Amcor's, not Defendants', estimates and judgements.  *Id.* at 95.  Similarly, Defendants' stated belief that Bemis' shareholders will "…benefit from the net cost synergies expected to result from the transaction, which are projected to be at least $180 million annually (on a pre-tax basis) by the end of New Amcor's third fiscal year . . . ." is rendered false and misleading for identical reasons. *Id.* at 90.

79.     The Proxy Statement's lack of transparency concerning synergies appears to be coming home to roost.  The Spruce Report highlights that Amcor and Bemis told an "organic" EPS growth story through suspect cost synergies.  According to Spruce Point, "Amcor claims $180m of Bemis deal cost synergies and avoids discussion of sales synergies. Based on our analysis, deal costs are rising faster than planned, and sales are vanishing." Spruce Report at 2. The Spruce Report continues by questioning Amcor's recent guidance on cost synergies related to the Transaction, calling it "dubious in light of evidence [Research and Development] spending is running $35mm below plan," concluding "Amcor was adamant at the deal announcement that cost synergies would not include [Research and Development] cuts."  *Id.*

***Material Omissions Concerning Goldman's Potential Conflicts of Interest***

80.     The Proxy Statement also failed to disclose material information concerning potential conflicts of interest faced by Goldman.

81.     According to the Proxy Statement, the Board's decision to approve the Transaction was supported by Goldman's opinion to the Board "to the effect that as of August 6, 2018 and based upon and subject to the factors and assumptions set forth in its opinion, the exchange ratio in the merger pursuant to the Transaction Agreement was fair from a financial point of view" to Bemis stockholders.  *Id.* at 89-91.  However, Goldman was incentivized to render, as it did, a favorable fairness opinion that the Merger Consideration was fair to Bemis' stockholders in order to secure additional business in connection with divestitures necessary to secure regulatory approval for the Transaction.  The initial draft of the Transaction Agreement Amcor's counsel sent to Bemis' counsel on July 13, 2018 contemplated a cap on potential divestitures.  Antitrust-related undertakings were a point of discussion for Amcor's and Bemis' counsel on July 23, 2018 and antitrust covenants were discussed by the Board at its July 24, 2018 Board meeting, at which Goldman was present.  Two days later, Goldman and Bemis entered into an engagement letter, which contemplated Goldman's role in any divestitures.  The Proxy Statement sets forth that:

> in connection with obtaining regulatory approval for the transaction, Amcor and/or Bemis may be required to divest one or more of their respective businesses. As approved by Bemis, Goldman Sachs' Merchant Banking Division, or funds, investment vehicles or other entities managed, sponsored or advised by Goldman Sachs' Merchant Banking Division or in which it may have economic interests may participate in any sale process with respect to such businesses, including potentially bidding on and purchasing one or more of such businesses.

*Id*. at 102.

82.     The Proxy Statement failed, however, to disclose: (i) when Bemis approved Goldman's Merchant Banking Division, or funds, investment vehicles or other entities managed, sponsored or advised by Goldman's Merchant Banking Division or in which it may have economic

interests, participating in any sale process with respect to the businesses that Amcor and/or Bemis might be required to divest in connection with obtaining regulatory approval for the Proposed Transaction, including potentially bidding on and purchasing one or more of such businesses; and (ii) the specific content and nature of the discussions Goldman had with Bemis regarding its potential participation in any sale process with respect to businesses Amcor and/or Bemis might be required to divest, including with respect to potentially bidding on and purchasing one or more of such businesses.  Unsurprisingly, the European Commission required Bemis to divest three plants located in the United Kingdom and Ireland in order to attain regulatory approval.  Similarly, the U.S. Department of Justice required Amcor to divest three manufacturing facilities located in Ashland, Massachusetts; Milwaukee, Wisconsin; and Madison, Wisconsin; along with certain related assets, to complete the Transaction.  As a result of the omission of the details of the timing and nature of negotiations concerning the terms of Goldman's engagement letter with respect to its participation in any divestitures, the Individual Defendants misled Bemis stockholders in their attempt to make the undervalued Transaction appear fair.

83.    Full disclosure of investment banker conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.  Without this information, Bemis stockholders were unable to understand the arrangements that Goldman was operating under in order to determine whether there were conflicts that called into question the independence of Goldman and/or the adequacy of its fairness opinion as a whole.

## CLAIMS FOR RELIEF

### COUNT I

**Class Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

84.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

85.     During the relevant period, Defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not materially false and misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

86.     By virtue of their positions within the Company, the Defendants were aware of this information and of their duty to disclose this information in the Proxy Statement.  The Proxy Statement was prepared, reviewed, and/or disseminated by the Defendants.  It misrepresented and/or omitted material facts, including material information about the synergies projected to be achieved pursuant to the Transaction and Goldman's potential conflicts of interest.  The Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

87.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would have considered them important in deciding how to vote on the Transaction.   In addition, a reasonable investor would have viewed a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

88.     The Proxy Statement is an essential link in causing Bemis stockholders to approve the Transaction.

89.     By reason of the foregoing, the Defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

90.     Because of the false and misleading statements in the Proxy Statement, Plaintiff and the Class were damaged.

## COUNT II

**Class Claims Against the Individual Defendants for
Violations of Section 20(a) of the Exchange Act**

91.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

92.     The Individual Defendants acted as controlling persons of Bemis within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Bemis and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

93.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

94.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Transaction.  They were, thus, directly involved in the making of this document.

95.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Transaction.  The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the directors.

96.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

97.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' conduct, Bemis' stockholders were irreparably harmed.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands relief in his favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.     Declaring that Defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

C.     Awarding Plaintiff and the Class compensatory and/or rescissory damages sustained as a result of Defendants' wrongdoing, including, but not limited to, pre-judgment and post-judgment interest;

D.     Awarding Plaintiff the costs of this action, including reasonable allowance for

plaintiff's attorneys' and experts' fees and expenses;

      E.      Awarding extraordinary and/or equitable relief as permitted by law, equity, and the

federal statutory provisions sued hereunder; and

      F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated:  May 11, 2020

                                        **WEISSLAW LLP**

                            By  _____
                                        Richard A. Acocelli
                                        1500 Broadway, 16th Floor
                                        New York, New York 10036
                                        Tel: (212) 682-3025
                                        Fax: (212) 682-3010
                                        Email: racocelli@weisslawllp.com

                                        *Attorneys for Plaintiff*

**OF COUNSEL:**

**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato
885 Third Avenue, Suite 3040
New York, New York 10022
Tel: (212) 308-5858
Fax: (212) 486-0462
Email: fortunato@bespc.com

*Attorneys for Plaintiff*

31