UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
                                                       :
                                                       :                19 Civ. 3356 (JPC)
                                                       :
IN RE: BEMIS CO. SECURITIES LITIGATION                 :          OPINION AND ORDER
                                                       :
                                                       :
--------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Lead Plaintiff Michael Dixon ("Plaintiff") brings this putative class action against Defendants Bemis Company Inc. ("Bemis") and the members of Bemis's Board of Directors (the "Board," collectively with Bemis, "Defendants"), contending that Defendants disseminated a materially false and misleading Definitive Proxy Statement (the "Proxy") in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Dkt. 14 ("Amended Complaint" or "Am. Compl."). Defendants have moved to dismiss the Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Dkts. 22, 23 ("Motion to Dismiss"). The Court heard oral argument on the Motion to Dismiss on December 8, 2020. *See* Dkt. 31 ("12/8/20 Tr."). For the reasons stated below, the Court grants the Motion to Dismiss in full, and dismisses this case with prejudice.

## I. Background

      The following background is based on allegations contained in the Amended Complaint, which are assumed to be true for the purposes of Defendants' Rule 12(b)(6) motion to dismiss. *See Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 401 (2d Cir. 2015). The Court also considers at this stage the Proxy, Dkt. 24-1, and the other exhibits attached to Defendants' motion papers, Dkts. 24-2, 24-3, 24-4, 24-5, which are all filings with the SEC. *See*

*Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) ("The court may . . . 'consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit.'" (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)); *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 382 (S.D.N.Y. 2020) (explaining why a district court may consider a proxy statement, as a public disclosure document required by law to be filed with the SEC, at the Rule 12(b)(6) stage in an action under Section 14(a) and Rule 14a-9).  It is further appropriate for the Court to consider the Proxy at this stage, in light of the extensive references to the Proxy in the Amended Complaint, *see Tongue*, 816 F.3d at 209; *Gray*, 454 F. Supp. 3d at 382-83, and because Plaintiff does not dispute the accuracy of the description of the events leading to the Transaction as set forth in the Proxy, *see Gray*, 454 F. Supp. 3d at 383.

## A.  The Transaction

This case arises out of statements contained in the Proxy, whose purpose was to solicit votes from Bemis shareholders in favor of a merger between Bemis and Amcor Limited ("Amcor").  That merger, which was ultimately approved by Bemis shareholders, resulted in the creation of New Amcor (the "Transaction").

Prior to the Transaction, Bemis was a Missouri corporation with approximately 16,000 employees worldwide that supplied flexible and rigid packaging products to food, consumer products, healthcare, and other companies.  Am. Compl. ¶¶ 2, 21, 46.  In 2017, Bemis launched a reorganization plan called "Agility," which was a multi-pronged approach designed to "fix, strengthen, and grow" its business.  *Id.* ¶ 2; Proxy at 76.  According to the Amended Complaint, Bemis's "results and [its] own public statements demonstrated that the Company was headed for

a turnaround."  Am. Compl. ¶ 2.  A Bemis press release dated July 26, 2018 that was filed with

the SEC as an exhibit to Bemis's Form 8-K,[1] however, announced that, while Bemis reported

strong earnings for the second quarter of 2018 and continued progress on Agility, Bemis revised

downward its full-year 2018 earnings per share guidance, which is generally considered a marker

of a company's profitability.  Dkt. 24-3 at 3; *see also* Am. Compl. ¶¶ 52-54.

    Amcor was a similar, though larger, corporation based out of Australia.   *See* Am.

Compl. ¶ 36.  Prior to the Transaction, Amcor "was a global leader in responsible packaging

solutions, supplying a broad range of rigid and flexible packaging products into the food, beverage,

healthcare, personal care and other fast moving consumer end markets," with "around 195 sites in

over 40 countries" and "approximately 35,000 employees."  *Id.*  Beginning in 2018, Amcor

approached Bemis with a number of offers for a merger between the two companies.

    First, on March 23, 2018, Amcor submitted a proposal to Bemis's Board to acquire Bemis.

Am. Compl. ¶ 58; Proxy at 80.  Under the terms of this first proposal, Bemis shareholders would

own 28% of the combined company and would receive 4.8 Amcor shares for each Bemis share,

implying a valuation of $52.00 per Bemis share.  Am. Compl. ¶ 58; Proxy at 80.  Amcor estimated

that the deal would provide synergies of approximately $6.00 per Bemis share in value for each

Bemis stockholder, resulting in a total per-share implied valuation of approximately $58.00 per

Bemis share.  Am. Compl. ¶ 58; Proxy at 80.  Goldman Sachs & Co. LLC ("Goldman"), Bemis's

longtime financial advisor, reviewed the offer and, in early May 2018, presented Bemis's Board

with preliminary financial analyses of the potential merger and Bemis's other options, after which

---

    [1] A Form 8-K is a "Current Report" that companies are required to file pursuant to Section
13 or 15(d) of the Exchange Act.  *See* Securities and Exchange Commission, Form 8-K,
https://www.sec.gov/about/forms/form8-k.pdf (last visited Dec. 17, 2020).

the Board rejected the proposal.  Proxy at 80-81.  Bemis continued to entertain other offers around this time and met with a private investment company to discuss a different potential transaction. *Id.* at 81.

Amcor submitted a revised proposal to Bemis's Board on June 5, 2018, now offering an exchange ratio of 5.0 Amcor shares per Bemis share, implying a valuation of $52.61 per Bemis share.  Am. Compl. ¶ 60; Proxy at 82.  This proposal would have resulted in Bemis shareholders owning approximately 28.4% of the combined company.  Proxy at 82.  Amcor estimated that the combined company would realize over $7.00 per Bemis share in additional value, providing a total per-share valuation of approximately $60.00.  Am. Compl. ¶ 60; Proxy at 82.  On June 15, 2018, Bemis's Board conducted another call during which, among other things, Goldman presented its preliminary financial analyses regarding Amcor's revised proposal.  Proxy at 82.  Defendant William F. Austen, then-Bemis's President, Chief Executive Officer, and a member of the Board, *see* Am. Compl. ¶ 22, conveyed to Amcor that Bemis's Board was supportive of conducting further analysis of a possible Bemis-Amcor merger, but asked that Amcor increase the fixed exchange rate in its proposal to 5.2 Amcor shares for each Bemis share.  Proxy at 82.  And as before, Bemis continued to explore other options by engaging in discussions with other parties regarding different possible transactions.  *Id.*

On June 20, 2018, Amcor submitted a second revised proposal, in which it offered to acquire Bemis at a ratio of 5.1 Amcor shares per Bemis share, implying a valuation of $53.40 per Bemis share.  Am. Compl. ¶¶ 61-62; Proxy at 82-83.  This second revised proposal entailed Bemis shareholders owning approximately 28.8% of the combined company.  Proxy at 83.  Amcor continued to suggest that the Transaction would deliver over $7.00 per Bemis share in additional

value, resulting in a valuation of approximately $61.00 per Bemis share.  Am. Compl. ¶¶ 61-62;
Proxy at 83.

Two days after receiving this second revised proposal from Amcor, Bemis's Board held an
update call attended by representatives of Goldman and others.  Proxy at 83.  During this June 22,
2018 call, Austen summarized Amcor's most recent proposal and further explained that another
party with whom Bemis had discussed a possible combination had not submitted a proposal for
such a transaction.  *Id.*  As reported in the Proxy, "[a]t the end of the discussions, Bemis' board of
directors directed Bemis' executive management team and outside advisors to continue the parties'
due diligence investigations regarding a potential combination of Bemis and Amcor and to begin
negotiations regarding the terms and conditions of a definitive transaction agreement."  *Id.*

Throughout late summer of 2018, Bemis and Amcor negotiated the Transaction, Am.
Compl. ¶ 63, and according to the Proxy, Bemis conducted significant due diligence, Proxy at 83-
84.   As examples, the Proxy reported that, on June 25, 2018, members of the executive
management teams of Bemis and Amcor "held an organizational call to plan mutual due diligence,
transaction structuring, and related matters," *id.* at 83, and that Bemis and Amcor met for
"reciprocal management presentations" regarding their respective businesses and synergy
opportunities that could be achieved from the Transaction on June 28 and 29, 2018 and July 18,
19, and 20, 2018, *id.* at 83, 85.  The Proxy further reported that during a July 6, 2018 Board
meeting, Austen "led a discussion of the due diligence process with Amcor, including a report on
the reciprocal management presentations that had occurred the prior week, and including the
identification and validation of potential synergy opportunities that could be achieved in the
potential transaction."  *Id.* at 84.  A few days later, on July 9 and 10, 2018, Bemis and Amcor
opened data chat rooms in connection with the ongoing due diligence regarding the potential

transaction.  *Id.*  Later in the month, at a July 24, 2018 meeting with the Board, Austen "reported on the recent series of reciprocal management presentations by Bemis and Amcor and on the updated analysis of the synergies that would be expected to result from a combination of the two companies," and "members of executive management summarized the status of due diligence and other key work streams related to consideration of the proposed Amcor transaction."  *Id.* at 85.

Then, on July 26, 2018, Bemis entered into an engagement letter with Goldman to discuss the possible sale of Bemis.  *Id.* at 86.  The following day, July 27, 2018, the Board again discussed potential synergies that could result from the Transaction.  *Id.*  A few days later, during an August 1, 2018 Board meeting, a "third-party consultant engaged by Amcor led a discussion of the nature and magnitude of the estimated synergies."  *Id.* at 87.

On August 6, 2018, Goldman rendered a fairness opinion.  Am. Compl. ¶ 64.  In it, Goldman expressed its "opinion that, as of the date hereof, the Exchange Ratio pursuant to the Agreement is fair from a financial point of view to the holders (other than Amcor and its affiliates) of Company Shares."  Proxy at C-3.  The Board subsequently approved the Transaction.  Am. Compl. ¶ 64.  Later that same day, Bemis and Amcor issued a joint press release announcing the agreement.  *Id.* ¶ 65.  On March 27, 2019, Bemis filed the Proxy with the SEC describing the Transaction.  *Id.* ¶ 5.  Bemis stockholders approved the Transaction on May 2, 2019, and the Transaction closed on June 11, 2019.  *Id.* ¶ 1.

## B.  The Proxy

The Proxy, including its attachments, totaled nearly 600 pages.  Some of the provisions most relevant to Defendants' Motion to Dismiss are discussed below.

Among other things, the Proxy outlined "four sets of projected financial information"—the "Bemis Forecasts", "Bemis' Adjusted Amcor Forecasts", the "Pro Forma Forecasts", and the "Net Synergies"—described, collectively, as the "Forecasts." Proxy at 102-08. The Net Synergies were defined as "certain operating synergies projected to result from the transaction (net of costs to achieve such synergies), based on a range of potential operating synergies jointly developed by the management of Amcor and Bemis and approved for Goldman Sachs' use by Bemis." *Id.* at 103. The Proxy reported that the Bemis Forecasts and the Pro Forma Forecasts were prepared by Bemis's management, Bemis's Adjusted Amcor Forecasts were prepared by Amcor's management and adjusted by Bemis's management, and the Net Synergies were developed jointly by the management of Amcor and Bemis. *Id.* The Proxy further disclosed that "Goldman Sachs assumed with Bemis' consent that the [Forecasts] had been reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of Bemis." *Id.* at 95.

The Proxy also contained a number of cautionary statements. For instance, it stated that the Forecasts "were not prepared with a view to public disclosure," but were included because they were available to the Board in considering the Transaction. *Id.* at 103. The Proxy warned that the Forecasts were not designed to "induce any Bemis shareholder to vote in favor of the transaction." *Id.* The Proxy also included a cautionary statement regarding "Certain Limitations on the Forecasts":

> Although a summary of the Forecasts is presented with numerical specificity, this information is not factual and should not be relied upon as being necessarily predictive of actual future results. The Forecasts are forward-looking statements. Important factors that may affect actual results and cause the Forecasts not to be achieved include any inaccuracy of the assumptions underlying the Forecasts . . . and the other factors described under 'Cautionary Statement Regarding Forward-Looking Statements' on page 14 of this proxy statement/prospectus. As a result,

> there can be no assurance that the Forecasts will be realized, and actual results may
> be materially better or worse than those contained in the Forecasts.

*Id.* at 104.

The Proxy additionally disclosed Goldman's role in the transaction, including Goldman's

potential conflicts of interest.  Specifically, the Proxy revealed that,

> in connection with obtaining regulatory approval for the transaction, Amcor and/or
> Bemis may be required to divest one or more of their respective businesses. As
> approved by Bemis, Goldman Sachs' Merchant Banking Division, or funds,
> investment vehicles or other entities managed, sponsored or advised by Goldman
> Sachs' Merchant Banking Division or in which it may have economic interests may
> participate in any sale process with respect to such businesses, including potentially
> bidding on and purchasing one or more of such businesses.

*Id.* at 102.

### C.  The Amended Complaint

Plaintiff filed his original complaint on April 15, 2019.  Dkt. 1.  On March 10, 2020, the

Honorable Paul G. Gardephe, to whom this case was previously assigned, consolidated this case

with *Stein v. Bemis Company Inc.*, No. 19 Civ. 3412 (PGG) (S.D.N.Y.) pursuant to Federal Rule

of Civil Procedure 42(a), and appointed Michael Dixon as Lead Plaintiff.  Dkt. 13.  Approximately

two months later, on May 11, 2020, Plaintiff filed the Amended Complaint on behalf of all Bemis

stockholders entitled to vote on the proposal to approve the Transaction and whose Bemis common

stock was exchanged for 5.1 New Amcor shares in connection with the Transaction.   Am.

Compl. ¶ 1.

Plaintiff's Amended Complaint alleges two counts.  Count One alleges that the Proxy

disseminated by Defendants "failed to disclose material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not materially false

and misleading," in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9

8

promulgated thereunder. *Id.* ¶ 85. Plaintiff alleges that the Proxy omitted material facts "about the synergies projected to be achieved pursuant to the Transaction and Goldman's potential conflict of interest." *Id.* ¶ 86. Specifically, Plaintiff alleges that the Proxy was false and misleading because it was "silent to the most important facts concerning [the] basis and formulation" of the Net Synergies, including: (1) "the assumptions and methodologies underlying the projected Net Synergies;" (2) "the specific role, if any, played by Bemis management, Defendants, or Bemis' financial advisor Goldman in the development and calculation of the projected Net Synergies;" and (3) "the identity and role played by Amcor's 'third-party' consultant in the development and calculation of the projected Net Synergies." *Id.* ¶ 76. Plaintiff further alleges that two declarations in the Proxy were materially false and misleading because the Net Synergies "reflect Amcor's, not Defendants', estimates and judgements": (1) that "the projected Net Synergies 'had been reasonably prepared on a basis reflecting the best currently available estimates and judgements of management of Bemis,'" and (2) that shareholders would "benefit from the net cost synergies expected to result from the transaction, which are projected to be at least $180 million annually (on a pre-tax basis) by the end of New Amcor's third fiscal year." *Id.* ¶¶ 11, 78. Count Two alleges that the individual Defendants, *i.e.*, the members of Bemis's Board, are liable under Section 20(a) of the Exchange Act as controlling persons of Bemis, because they had the ability to and did exercise control over persons who violated Section 14(a) and SEC Rule 14a-9. *Id.* ¶¶ 91-97.

Defendants have moved to dismiss the Amended Complaint, contending that it fails to state a Section 14(a) claim by not alleging (1) a false or misleading statement or omission and, alternatively, (2) loss causation. Motion to Dismiss at 13-24. Since the Section 20 claim is

derivative of the Section 14(a) claim, Defendants argue that claim must be dismissed as well.  *Id.*
at 25.

## II.  Discussion

### A.  Standard of Review

Under Rule 8 of the Federal Rules of Civil Procedure, a pleading must contain a "short and
plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).
"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as
true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678
(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A pleading that offers
'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not
do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked
assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

The parties agree that Plaintiff's Amended Complaint alleges negligence, and therefore
Rule 8, and not Rule 9(b), applies.[2]  *See* Opposition at 11-12; 12/8/20 Tr. at 5-6; *see Litwin v.
Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011).  Nonetheless, the Private Securities
Litigation Reform Act ("PSLRA") requires that, for "each private action arising under this chapter
that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure," like the
claims at issue here, the complaint must "specify each statement alleged to have been misleading,

---

[2]  The Court notes that certain allegations in the Amended Complaint—such as the
allegations that Bemis disseminated a materially false and misleading Proxy and that members of
the Board were aware of certain omitted information and their duty to disclose that information,
Am. Compl. ¶¶ 1, 86—arguably do "sound in fraud" under *Rombach v. Chang*, 355 F.3d 164, 172
(2d Cir. 2004) such that they would trigger Rule 9(b).  The Court nonetheless does not apply Rule
9(b)'s heightened pleading standard because both parties have explicitly disclaimed any
allegations of fraud.

the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."   15 U.S.C. § 78u-4(a)(1), (b)(1)(B); *see Bond Opportunity Fund v. Unilab Corp.*, No. 99 Civ. 11074 (JSM), 2003 WL 21058251, at *4 (S.D.N.Y. May 9, 2003) (applying the PSLRA's pleading requirements to a Section 14(a) negligence claim and explaining that "under the standards imposed by the PSLRA, Plaintiffs must plead with particularity facts that give rise to a strong inference of negligence on the part of all Defendants"), *aff'd*, 87 F. App'x 772 (2d Cir. 2004); *see also Furlong Fund LLC v. VBI Vaccines, Inc.*, No. 14 Civ. 9435 (SHS), 2016 WL 1181710, at *3 (S.D.N.Y. Mar. 25, 2016) ("The PSLRA's pleading requirements as to misleading statements and omissions apply to Section 14(a) claims sounding in negligence, such as those here."); *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 286 (S.D.N.Y. 2010) ("The PSLRA, for its part, has 'imposed heightened pleading requirements and a loss causation requirement upon 'any private action' arising from the Securities Exchange Act.'" (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc*., 552 U.S. 148, 165 (2008)); *In re JP Morgan Chase Sec. Litig*., 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005) ("Even if plaintiffs had not brought a Section 14(a) claim sounding in fraud, pursuant to the PSLRA, 15 U.S.C. § 78u-4(b)(1), they would still have had to plead facts indicating why the alleged misrepresentations were misleading.").

Accordingly, "[P]laintiffs 'must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so.'" *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp*., 300 F. Supp. 3d 551, 564 (S.D.N.Y. 2018), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) (quoting *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)).  Similarly, under Rule 14a-9, Plaintiff must identify a

statement "which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

Furthermore, as discussed below, central to the Court's resolution of the Motion to Dismiss is the PSLRA's safe harbor provision for forward-looking statements, which requires "actual knowledge" of the false or misleading nature of the statement to impose liability.  *See* 15 U.S.C. § 78u-5(c).  "[W]here proof of scienter is a required element, as it is in the actual knowledge prong of the statutory safe harbor, a complaint must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (citing 15 U.S.C. § 78u-4(b)(2)).

### B.  Plaintiff's Section 14(a) Claim

In Count One, Plaintiff alleges that Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.  Section 14(a) makes it unlawful to solicit proxies "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78n(a).  Rule 14a-9 prohibits proxy solicitation "by means of any proxy statement . . . containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9(a).

Plaintiff alleges that Defendants violated Section 14(a) and Rule 14a-9 by disseminating a false and misleading Proxy, which "misrepresented and/or omitted material facts, including material information about the synergies projected to be achieved pursuant to the Transaction and Goldman's potential conflict of interest."  Am. Compl. ¶¶ 85, 86.  Count One further alleges that

the alleged omissions and false and misleading statements in the Proxy were "material in that a reasonable stockholder would have considered them important in deciding how to vote on the Transaction" and "a reasonable investor would have viewed a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonable available to stockholders." *Id.* ¶ 87.  The allegedly materially misleading information in the Proxy concerned "(i) the synergies projected to be achieved pursuant to the Transaction, which were jointly developed by Bemis and Amcor management and defined in the Proxy as 'Net Synergies;' (ii) Defendants' good-faith opinions and beliefs concerning the projected Net Synergies; and (iii) potential conflicts of interests faced by Goldman, Bemis' financial advisor." *Id.* ¶ 5; *accord id.* ¶ 72.

In his Opposition to the Motion to Dismiss, Plaintiff alleges new facts not alleged in the Amended Complaint and appears to advance new legal theories of liability.   Dkt. 28 ("Opposition").  He now claims the Proxy was false and misleading because: (1) "it fails to disclose a pre-existing set of material projections (the Bemis Net Synergies) that differ from those disclosed in the Proxy;" (2) "it fails to disclose the basis, assumptions and rationale for the creation of Bemis Net Synergies;" (3) "it contains misleading statements concerning the basis for Bemis management's revising and abandoning the Bemis Net Synergy projections;" and (4) "it contains misleading statements concerning Bemis' Management's opinion of and belief in the substance of the Net Synergy Projections." *Id.* at 5.

For reasons that follow, the Court holds that Plaintiff fails to state a Section 14(a) claim because the statements at issue are protected by the PSLRA's safe harbor provision; because

Plaintiff has not pleaded an actionable omission or opinion statement; and because the Proxy sufficiently disclosed Goldman's potential conflicts of interest.[3]

> i.  *Bemis's Statements About Expected Net Synergies Are Covered by the PSLRA's Safe Harbor*

The PSLRA protects a defendant from liability for a securities law violation based on "any forward-looking statement."   15 U.S.C. § 77z-2(c)(1).   Under the PSLRA, forward-looking statements include those "containing a projection of revenues," those containing "earnings (including earnings loss) per share," and those "of future economic performance," as well as "any statement of the assumptions underlying" such statements.  *Id.* § 78u-5(i)(1)(A), (C), (D).

"A statement may contain some elements that look forward and others that do not," and "forward-looking elements" may be "severable" from "non-forward-looking" elements.  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016) (citing *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010)).  Under the PSLRA, a defendant is not liable "with respect to any forward-looking statement, whether written or oral, if and to the extent" that:

> (A) the forward-looking statement is (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial; or
>
> (B) the plaintiff fails to prove that the forward-looking statement—(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or (ii) if made by a business entity, was—(I) made by or with the approval of an executive officer of that entity; and (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

---

[3] As discussed below, Plaintiff has abandoned his allegation that the Proxy was materially misleading by failing to disclose potential conflicts of interests of Goldman.  *See* 12/8/20 Tr. at 66. In any event, for reasons that follow, the Court finds that any such theory must fail, because the Proxy sufficiently disclosed Goldman's potential conflict of interest.  *See infra* II.B.v.

15 U.S.C. § 78u-5(c)(1).  Because that provision is written in the disjunctive, "a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."  *Slayton*, 604 F.3d at 766.  Here, the statements in the Proxy concerning the Net Synergies are protected under 15 U.S.C. § 78u-5(c) because they are forward-looking statements that were accompanied by meaningful cautionary language and, alternatively, because Plaintiff pleads no facts permitting a conclusion that Defendants had actual knowledge of any false or misleading information in the Net Synergies.

The Net Synergies fall squarely within the PSLRA's definition of a forward-looking statement, as they "contain[] a projection of revenues" and "earnings (including earnings loss) per share," and also constitute a statement of "future economic performance."  15 U.S.C. § 78u-5(i)(1)(A), (C).  The Proxy defined the Net Synergies as "certain operating synergies projected to result from the transaction (net of costs to achieve such synergies), based on a range of potential operating synergies jointly developed by the management of Amcor and Bemis."  Proxy at 103; *accord id.* at 107.  The Proxy explained that the Net Synergies "were calculated to be $(17) million, $76 million and $200 million for 2009E, 2020E and 2021E, respectively."  *Id.* at 107; *accord id.* at 108; *see Gray*, 454 F. Supp. 3d at 390 ("That is inherent in the notion of a projection—it is 'the phenomenon of making calculated guess into the future according to past trends.'" (quoting *Projection*, *Black's Law Dictionary Online*, https://thelawdictionary.org/projection/)).  Further, the Proxy identified the Net Synergies as a forward-looking statement, *see* 15 U.S.C. § 78u-5(c)(1)(A)(i), expressly describing the Net Synergies as "certain operating synergies projected to result from the transaction," Proxy at 103.  And the statements in the Proxy concerning the Board's belief in such projections—*i.e.*, that the Forecasts, including the Net Synergies,

"reflect[ed] the best currently available estimates and judgements of management of Bemis," *id.* at 95, and that shareholders would benefit from the synergies, *id.* at 20—were similarly forward-looking.  *See Gray*, 454 F. Supp. 3d at 387 (S.D.N.Y. 2020) ("Courts within this Circuit have found that statements which merely endorse or state the speaker's belief in a certain future outlook satisfy the PSLRA forward-looking requirement."); *id.* (concluding that statements regarding a board's belief in projections were forward-looking because "the allegations turn on the reasonableness of the [projections] and the judgment that those projections . . . best reflect management's judgment about the future performance" of the company, which "is precisely the inquiry that the safe harbor puts off-limits to the courts"); *Gissin v. Endres*, 739 F. Supp. 2d 488, 507 n.108 (S.D.N.Y. 2010) (determining that statements that "based on our current expectation of cash flows from operations and . . . investments . . . we feel we will be in a position to fund [anticipated] capital investments for the year" and "based on our current view and what we know now, yes, we think we'll be just fine" were forward-looking statement protected by the PSLRA); *see also City of Hialeah Emps.' Ret. Sys. v. FEI Co.*, 289 F. Supp. 3d 1162, 1173 (D. Or. 2018) ("To take the view that an expression of 'present belief' in a forward-looking statement is a 'present fact'—and therefore not itself a forward-looking statement—would work an end-run around the PSLRA's safe harbor provision.").

Second, the forward-looking statements in the Proxy regarding Net Synergies and the Forecasts, of which the Net Synergies are a part, were supported by substantial amounts of cautionary language.  "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information."  *Slayton*, 604 F.3d at 772.  Such language must be "extensive and specific," and cannot be a "vague or blanket (boilerplate) disclaimer which

merely warns the reader that the investment has risks." *Id.* (quoting *Inst. Invs. Grp. v. Avaya, Inc*., 564 F.3d 242, 256 (3d Cir. 2009)).

Here, the Proxy contained a section entitled "Cautionary Statement Regarding Forward-Looking Statements," which warned that the Proxy contained forward-looking statements, and that "[w]hile Amcor and Bemis believe these . . . projections are reasonable, such forward-looking statements are only predictions and involve known and unknown risks and uncertainties."  Proxy at 14.  That section noted a number of potential risks that might impact the outcome of the Transaction, including the "ability to implement integration plans for the transaction and the ability to recognize the anticipated growth and cost savings and other benefits of the transaction."  *Id.* The Proxy further cautioned that the information regarding the Forecasts "is not factual and should not be relied upon as being necessarily predictive of actual future results" and that "there can be no assurance that the Forecasts will be realized, and actual results may be materially better or worse than those contained in the Forecasts."  *Id.* at 104.  Indeed, the discussion of the Forecasts was prefaced by language expressing Bemis's general reluctance to disclose financial forecasts because of the inherent uncertainty with such projections:  "Bemis does not, as a matter of course, regularly develop or publicly disclose long-term projections or internal projections of its future financial performance, revenues, earnings, financial condition or other results due to, among other reasons, the uncertainty of the underlying assumptions and estimates."  *Id.* at 102-03.  The Proxy added that the Forecasts were not included to "induce" any shareholder to vote for the Transaction, but rather were included because Bemis's Board considered them in evaluating the Transaction. *Id.* at 103.[4]

---

[4] The Proxy similarly noted that Bemis's Board "considered a variety of risks and other countervailing factors, including":

These excerpts from the Proxy, taken together, expressed caution in a manner that was "extensive and specific," and was not the "boilerplate" language the Second Circuit has found insufficient or criticized. *See Slayton*, 604 F.3d at 772-73. Unlike in *Slayton*, for example, the Proxy did not simply include vague warnings that the predicted Net Synergies might not result if the industry suffered. *See id.* (concluding that a warning that "potential deterioration in the high-yield sector . . . could result in further losses in [defendant's] portfolio" was "vague" and "mere boilerplate, essentially warning that 'if our portfolio deteriorates, then there will be losses in our portfolio'"). Rather, the Proxy provided significant disclosures and cautionary language regarding both the Forecasts as a whole and the Net Synergies specifically, which were "tailored to the specific future projection[s]" at issue. *Id.* at 773.

In fact, the cautionary statements in the Proxy are quite similar to those that the Third Circuit recently found to be adequate in *Laborers Local No. 231 Pension Fund v. Cowan*, No. 20-1844, 2020 WL 7056070 (3d Cir. Dec. 2, 2020). In *Cowan*, the Third Circuit considered the plaintiff's claim that certain "Fairness Projections" in a proxy statement, which were allegedly lower than other internal projections that the defendant company had made, were false and misleading because they "caused shareholders to believe the buyout would be more attractive than it was." *Id.* at *3. The Third Circuit noted that the proxy statement cautioned that: (1) the projections were "included solely to give the [company's] stockholders access to certain financial

---

The challenges inherent in the combination of two business enterprises of the size and scope of Amcor and Bemis and the cross-border nature of the combined company, including the possibility that the anticipated cost savings, synergies, and other benefits sought to be obtained from the transaction might not be achieved in the time frame contemplated or at all and the other numerous risks and uncertainties that could adversely affect New Amcor's operating results or the liquidity or trading price of New Amcor Shares.

Proxy 92-93.

projections that were made available to" various decision-makers involved in the buyout, including the company's Board of Directors; (2) the projections were not included "to influence a . . . stockholder's decision whether to vote for the merger agreement or for any other purpose;" (3) the projections "should not be regarded as an indication that [the company] and/or any of [its] affiliates, officers, directors, advisors or other representatives consider the forecasts to be predictive of actual future events;" and (4) shareholders should not "place undue, if any, reliance on the forecasts." *Id.* Accordingly, the Third Circuit, relying on its previous decision in *OFI Asset Management v. Cooper Tire & Rubber*, 834 F.3d 481 (3d Cir. 2016), which considered similar facts, held that the projections were not actionable because they were "expressly disclaimed as being disclosed solely for the reason that they were made available to individuals and entities other than the shareholders." *Cowan*, 2020 WL 7056070, at *4 . Similarly, the Proxy issued by Bemis warned that the Forecasts were "not factual and should not be relied upon as being necessarily predictive of actual future results," Proxy at 104; stated that they were not included to "induce" any shareholder to vote for the Transaction but rather were disclosed because the Board considered them in assessing the Transaction, *id.* at 103; and cautioned that if shareholders were to consider them at all, they should be careful to do so in conjunction with the other information in the Proxy, *id.* Thus, as in *Cowan*, this ample, specific cautionary language insulates Defendants from liability under Section 14(a).

Plaintiff argues this cautionary language was insufficient because the Proxy did not "disclose that the Net Synergy Projections were not prepared on a reasonable basis and in good faith, and did not reflect management's best estimates." Opposition at 21. As Judge Liman recently observed in rejecting a nearly identical argument in *Gray*, "[t]his argument conflates the actual knowledge and meaningful cautionary language prongs of the PSLRA," and would mean

that "an allegation of actual knowledge of falsity would suffice to deprive a forward-looking statement of the protections of safe harbor even if there were meaningful cautionary language otherwise." *Gray*, 454 F. Supp. 3d at 394.  But "[s]uch a result would be contrary to the disjunctive nature of the safe harbor elements."  *Id.*  Moreover, while "cautionary language that is misleading in light of historical fact cannot be meaningful," *Slayton*, 604 F.3d at 770, Plaintiff's position rests on his speculation, unsupported by any pleaded factual allegations, that the Board did not believe in these projections.  Accordingly, because Plaintiff has not adequately pleaded any facts that make the cautionary language misleading, he has not shown that the cautionary language was inadequate.

Finally, the Net Synergies also are protected by the PSLRA's safe harbor because, even if the Proxy had not contained the meaningful cautionary language discussed above, Plaintiff fails to plead any facts supporting a finding that Defendants had actual knowledge that the statements were false.   Under the PSLRA's heightened pleading standard for scienter, a "complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 324 (2007).  "In determining whether a strong inference exists, the allegations are not to be reviewed independently or in isolation, but the facts alleged must be 'taken collectively.'"  *Slayton*, 604 F.3d at 766 (quoting *Tellabs, Inc.*, 551 U.S. at 323). "The 'strong inference' standard is met when the inference of fraud is at least as likely as any non-culpable explanations offered."  *Id.* (quoting *Tellabs, Inc.*, 551 U.S. at 324).  In making this inquiry, the Court must (1) accept all factual allegations in the Amended Complaint as true, *id.* at 774; (2) consider the Amended Complaint and all documents incorporated into the Amended Complaint "in their entirety," assessing "'whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets

that standard,'" *id.* (quoting *Tellabs Inc.*, 551 U.S. at 322-23); and (3) consider "'plausible opposing inferences'" from those facts, *id.* (quoting *Tellabs Inc.*, 551 U.S. at 323).

Here, Plaintiff alleges that Defendants "were aware" of the alleged falsity of the Forecasts "[b]y virtue of their positions with the Company."  Am. Compl. ¶ 86.  The Amended Complaint pleads no other facts supporting an inference that Defendants had actual knowledge that any statements in the Proxy were false.  And Plaintiff even vacillates on this point, arguing that the Defendants "were at least negligent."  *Id.*  Such conclusory assertions, without particularized facts giving rise to a strong inference of the requisite state of mind, are insufficient to plead actual knowledge that the Net Synergies were false or misleading.  *See Slayton*, 604 F.3d at 766 ("[W]here proof of scienter is a required element, as it is in the actual knowledge prong of the statutory safe harbor, a complaint must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" (quoting 15 U.S.C. § 78u-4b(2)); *Xerox Corp.*, 300 F. Supp. 3d at 568 (concluding that liability for forward-looking statements under PSLRA is "stricter than for statements of current fact" and requires "proof of knowing falsity," not mere recklessness (quoting *Slayton*, 604 F.3d at 773)); *see also In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016) ("Scienter, however, 'cannot be inferred solely from the fact that, due to the defendants' board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information.'" (quoting *Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 212 (S.D.N.Y. 2012)).

Plaintiff also broadly contends that the individual Defendants had motive to engage in the Transaction.  Am. Compl. ¶¶ 66-70.  "While 'the absence of a motive allegation is not fatal,' motive can be a relevant factor, and 'personal financial gain may weigh heavily in favor of a scienter inference.'"  *Slayton*, 604 F.3d at 776 (quoting *Tellabs, Inc.*, 551 U.S. at 325).

Specifically, Plaintiff alleges that the executives would each receive specific equity awards that would be subject to an expedited vesting period and cash severance payments if terminated.  Am. Compl. ¶¶ 67, 68.  Plaintiff also alleges that all but two executives would receive a retention bonus award for their continued work, and that the other two executives would have certain consulting arrangements with the new company.  *Id.* ¶¶ 69, 70; *see* Proxy 108-11 (revealing interests of Bemis's Directors and Executive Officers in the Transaction, including with respect to treatment of the Bemis Equity Awards and the management and retention agreements with, and the long-term incentive awards for, Executive Officers).

At best, Plaintiff's allegations as to the motive of the individual Defendants only tenuously support an inference of scienter.  Such a statement of "generalized incentive commonly available to corporate executives," without more, is insufficient to establish a plausible claim of scienter. *Gray*, 454 F. Supp. 3d at 396; *see Cherry St., LLC v. Hennessee Grp.*, 573 F.3d 98, 109 (2d Cir. 2009) (explaining that allegations of "goals that are possessed by virtually all corporate insiders" such as "increas[ing] executive compensation," are insufficient to show fraudulent intent (internal quotation marks omitted)).  The existence of certain executive compensation packages here, which are by no means unheard of in a merger agreement, only goes so far to support a finding of scienter. Moreover, the allegations here are somewhat in tension with Plaintiff's contention that Bemis, and presumably its executives, would have been *more successful* had Bemis not merged with Amcor. *See* Opposition at 23.  In other words, the idea that these payouts motivated executives to actively mislead their shareholders is at least somewhat undermined both by the job uncertainty that would accompany the Transaction, as evidenced by the provisions providing for severance payments, and Plaintiff's own allegations regarding the strength of Bemis on a standalone basis.  *See Gray*, 454 F. Supp. 3d at 396 ("[T]he allegation of motive and opportunity in the form of [the defendant's]

golden parachute compensation is undermined by the plausible inference of uncertainty over future employment . . . ."). While Plaintiff's theory of motivation is not implausible, it provides a rather speculative foundation that the Court finds, on its own, less than "compelling" to establish a plausible claim of fraudulent intent. *S. Cherry St.*, 573 F.3d at 111.

Moreover, Plaintiff fails to show a compelling inference of scienter for a more fundamental reason: The facts alleged in the Amended Complaint, particularly the timeline of the development of the Net Synergies, simply do not support a strong inference that Defendants knew the Net Synergies were false or misleading. Plaintiff recognizes that "Bemis management and Board did not even begin considering the value of those synergies until July," and speculates that, based on the condensed timeline and similarity between the Net Synergies and Amcor's predicted synergies, Defendants must have "capitulated" to Amcor's "self-serving estimates." Am. Compl. ¶ 77. But a significantly more compelling inference is that, after Amcor approached Bemis with a proposal for a merger and made subsequent proposals following Bemis's rejection of the first one, Bemis conducted due diligence on Amcor and the potential merger, the two companies shared certain information, and then, using this shared information, the two companies developed estimates of potential synergies from the Transaction. Importantly, Plaintiff does not allege that Bemis revised its predictions of its *own* company's financial success. Put differently, Amcor, as the acquiring company, provided Bemis with certain new information about Amcor's business and how a merger with Bemis may give rise to certain synergies, which allowed the two companies to jointly develop a prediction about such potential synergies.[5] That those synergy predictions were similar or even

---

[5] Even if the Bemis Net Synergies existed, which, as discussed in detail below, Plaintiff did not actually plead in the Amended Complaint, this would still not support a finding of knowledge. The mere existence of initial predictions, without more, does not mean that Defendants were wedded to those initial predictions, and that their adoption of a different prediction later was improper.

identical to Amcor's predictions alone does not support an inference that Bemis's Board knew those predictions were false or misleading, particularly in the absence of any allegations that allow the inference that Amcor's initial projections were incorrect, misinformed, or over-inflated. Accordingly, even if Bemis ultimately adopted Amcor's initial projections, it does not follow that Bemis "capitulated" to Amcor's projections, guided by some nefarious intent; a more compelling inference is that Bemis concluded that Amcor's initial projections were in fact correct.

In sum, the Proxy's forward-looking statements regarding the Net Synergies were forward-looking and are covered by the PSLRA's safe harbor provision.  Although Plaintiff disclaims any intent to attack the substance of the predictions, *see* Opposition at 20 ("Plaintiff does not challenge their accuracy or that their substance is otherwise false and misleading"), his motion papers demonstrate that he is, at least in part, challenging the Board's adoption of the Net Synergies as the best predictive measure, *see id.* at 22 ("[T]here is compelling evidence based upon existing disclosures in the Proxy that Defendants knowingly capitulated to Amcor's synergies estimates and revised and abandoned their own undisclosed synergy projections.").  This is exactly what the safe harbor provision protects.[6]

---

[6] Defendants also argue in a footnote that the Net Synergies statements are inactionable under the so-called "bespeaks caution" doctrine for substantially the same reasons that they are inactionable under the PSLRA's safe harbor provision.  Motion to Dismiss at 15 n.13.  The Court agrees.  The "bespeaks caution" doctrine contemplates a similar inquiry as the PSLRA's safe harbor.  Under this doctrine, certain alleged misrepresentations can be rendered immaterial as a matter of law if "it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language."  *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).  As discussed more fully above, the Proxy's Net Synergies projections were accompanied by specific and meaningful cautionary language.  Thus, "'it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same'" disclosure.  *St. Clair-Hibbard v. Am. Fin. Tr., Inc*., No. 18 Civ. 1148 (LGS), 2019 WL 4601720, at *5 (S.D.N.Y. Sept. 23, 2019) (quoting *Rombach*, 355 F.3d 164, 173 (2d Cir. 2004)).  Accordingly, the challenged statements are protected by the bespeaks caution doctrine as well.

ii.     *Plaintiff Fails to Plead a Material Omission in the Amended Complaint*

The next question is whether Plaintiff alleges an actionable material omission.  Courts in the Second Circuit "have consistently held that neither the PSLRA safe harbor, nor the bespeaks-caution doctrine protects material omissions."  *Wilson v. LSB Indus., Inc*., No. 15 Civ. 7614 (RA), 2017 WL 7052046, at *3 (S.D.N.Y. Mar. 2, 2017); *see Slayton*, 604 F.3d at 770 ("[C]autionary language that is misleading in light of historical fact cannot be meaningful . . . ."); *MF Glob., Ltd*., 620 F.3d at 142 ("That allegation specifies an omission of present fact, to which bespeaks caution does not apply . . . .").  "[O]mission of information from a proxy statement will violate [Section 14(a) or Rule 14a-9] if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading."  *Resnik v. Swartz*, 303 F.3d 147, 151 (2d Cir. 2002).  In the context of a proxy statement, a fact is material "'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'"  *Id.* (quoting *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090 (1991)).  "'Once the proxy statement purport[s] to disclose the factors considered [by the board of directors] . . . , there [i]s an obligation to portray them accurately.'"  *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1198 (2d Cir. 1993) (quoting *Va. Bankshares, Inc.*, 501 U.S. at 1098 n.7).

Plaintiff does not point to any relevant SEC regulation requiring disclosure of additional information not disclosed in the Proxy, but instead broadly contends that "any misstatement or omission regarding those Net Synergy Projections is material as a matter of law."  Opposition at 13-14 (citing *Va. Bankshares, Inc.*, 501 U.S. at 1090-91; *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 992 (2d Cir. 1988)).  But that is not the law.  The Board was only required to disclose material facts, *i.e.*, facts for which "'there is a substantial likelihood that a reasonable shareholder would consider . . . important in deciding how to vote.'"  *Va. Bankshares, Inc.*, 501 U.S. at 1090

(quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  Plaintiff's theory that *any* omission is material would completely obfuscate this well-established standard.  When viewed under the proper standard, it is clear that Plaintiff has pointed to no material facts that were omitted from the Proxy that would render it false or misleading.

First, Plaintiff claims that the Proxy was false and misleading because it was "silent" as to "the assumptions and methodologies underlying the projected Net Synergies."  Am. Compl. ¶ 76. This is simply incorrect:  The Proxy provided ample descriptions of the assumptions and methodologies relevant to the development of the Net Synergies.  The Proxy stated that all Forecasts—the Net Synergies included—reflected "numerous assumptions and estimates as to future events," and provided a non-exhaustive set of those assumptions.  Proxy at 104-05.  As set forth in the Proxy, those assumptions included: (1) Bemis's North America volumes would stabilize and begin to grow through execution of the Agility initiatives; (2) Bemis would capture increasing levels of short-run business in North America, along with increased exposure to small food and beverage, as well as consumer and industrial, customers; (3) stabilization of Brazil's economy in 2018 with a return to modest growth in that country in 2019; (4) particular effective tax rates for Bemis, Amcor, and New Amcor for certain periods; (5) aggregate capital expenditures for Bemis of $160 million in 2018 and $185 million for each year thereafter; and (6) "Bemis would maintain leverage at a net debt to EBITDA[7] ratio of 2.6x, its dividend would increase by $0.04 per Bemis Share annually, and any free cash flow in excess of such dividends would be used for repurchase of Bemis Shares."  *Id.*

---

[7] "EBITDA" refers to earnings before interest, taxes, depreciation, and amortization. *See, e.g.*, Proxy at 105.

The Proxy also gave a detailed description of the Net Synergies and the financial analyses used to calculate the Forecasts.  *Id.* at 104-08.  While the Proxy provided more details as to the three other types of Forecasts, as it included charts demonstrating how they were calculated, *see id.*, the disclosure of these calculations did not somehow mandate parallel disclosures for the Net Synergies, nor does Plaintiff argue as much.  Moreover, the Proxy cautioned that while it gave "a summary of the Forecasts . . . with numerical specificity, this information is not factual and should not be relied upon as being necessarily predictive of actual future results."  *Id.* at 104.  The cautionary language discussed above is relevant here as well, *see supra* II.B.i., as those cautions made clear that the Net Synergies were not comprehensive.  *See* Proxy at 102-03 ("Bemis does not, as a matter of course, regularly develop or publicly disclose long-term projections or internal projections of its future financial performance, revenues, earnings, financial condition or other results due to, among other reasons, the uncertainty of the underlying assumptions and estimates."), 103 (emphasizing that the Forecasts were "not prepared with a view to public disclosure, but [were] included in this proxy statement/prospectus because such information was made available to Bemis' board of directors, Goldman Sachs and (with respect to the Bemis Forecasts) Amcor, and used in the process leading to the execution of the Transaction Agreement").

Importantly, Plaintiff does not point to any specific facts that Bemis failed to include as to the assumptions and methodologies underlying the Net Synergies that made the Proxy misleading. While Plaintiff contends that "full transparency" in the Proxy was required, Opposition at 18 n.14, and that "any" omission is therefore material, *id.* at 13-14, Plaintiff must allege more to state a claim.  The PSLRA's heightened pleading standard requires him to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an

allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B).  Further, under Rule 14a-9, Plaintiff must identify a statement "which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.  But while the Amended Complaint does point to the specific statements alleged to be misleading, it does not give the reasons why those claims were misleading beyond the bare speculation that Defendants and Goldman "capitulated to Amcor's self-serving estimates of the projected value of the Net Synergies."  Am. Compl. ¶ 77.  This fails to meet a Rule 8 pleading standard, let alone the requirements under the PSLRA.

Second, Plaintiff alleges in the Amended Complaint that the Proxy was false or misleading because it did not disclose "the specific role, if any, played by Bemis management, Defendants, or Bemis' financial advisor Goldman in the development and calculation of the projected Net Synergies."  Am. Compl. ¶ 76.  But this allegation is refuted by the plain text of the Proxy, which clearly did provide significant details regarding the roles of the various parties involved in the Transaction, including Goldman.  The Proxy stated that the Net Synergies were "based on a range of potential operating synergies jointly developed by the managements of Amcor and Bemis and approved for Goldman Sachs' use by Bemis."  Proxy at 103.  The role of Amcor and Bemis was therefore to develop the forecast, and Goldman's role was to use it.  Importantly, Plaintiff again fails to allege any specific facts that Defendants should have disclosed in this respect to avoid making the Proxy misleading.  Plaintiff simply gives no reason that the alleged omissions—which are simply additional details—"make[] other statements in the proxy statement materially false or misleading."  *Resnik*, 303 F.3d at 151.

Third, Plaintiff contends in the Amended Complaint that the Proxy was false and misleading because it did not disclose "the identity and role played by Amcor's 'third-party' consultant in the development and calculation of the projected Net Synergies."  Am. Compl. ¶ 76. While the name of the consultant was not identified in the Proxy, the Proxy revealed that Amcor engaged a third-party consultant who, at an August 1, 2018 meeting of Bemis's Board, "led a discussion of the nature and magnitude of the estimated synergies."  Proxy at 87.  This contention must be rejected as well because, once again, Plaintiff fails to plead how the absence of further details as to this third-party consultant constituted an omission of a material fact that was necessary to make the Proxy not false or misleading.  *See* 17 C.F.R. § 240.14a-9(a).

iii.   *The Directors' Stated Belief in the Net Synergies Is a Protected Statement of Opinion*

Even if Plaintiff had managed to allege an omission, his claim that the Proxy's statement reflecting the Board's faith in the Net Synergies was misleading would fail for another reason:  It is a protected statement of opinion.  Opinion statements are only actionable if Plaintiff "identif[ies] particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).  "[O]pinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor."  *Tongue*, 816 F.3d at 210 (citing *Omnicare, Inc.*, 575 U.S. at 1332).

Plaintiff contends that the statement in the Proxy that "the projected Net Synergies 'had been reasonably prepared on a basis reflecting the best currently available estimates and

judgements of management of Bemis'" was materially false and misleading because the Net Synergies "reflect Amcor's, not Defendants', estimates and judgements." Am. Compl. ¶ 78; *see also id.* ¶ 11. This statement from the Proxy provided, in relevant part, that "Goldman Sachs assumed with Bemis' consent that the Bemis Forecasts, Bemis' Adjusted Amcor Forecasts, the Pro Forma Forecasts and the Net Synergies had been reasonably prepared on a basis reflecting the best currently available estimates and judgements of management of Bemis." Proxy at 95.

Plaintiff does not allege that Goldman did not assume this, nor does he allege any specific facts supporting a finding that the estimates and judgments forming the basis of the Net Synergies were not "the best currently available estimates and judgements of management of Bemis." *Id.* In other words, even if the projections were the same as those originally set forth by Amcor, that does not mean that the projections were not based on "the best currently available estimates and judgements of management of Bemis." Nor does it imply that Bemis management did not believe in the accuracy of the predictions. In sum, there are no facts pleaded in the Amended Complaint that allow for an inference that these predictions were not shared by the Board, but only speculation that Bemis "capitulated" to Amcor's estimates to "make the Transaction more appealing." Am. Compl. ¶ 77.[8]

iv.   *Even if the Court Does Consider the New Facts Alleged in Plaintiff's Opposition, They Do Not Support a Claim for Relief*

In his Opposition, Plaintiff asserts new factual allegations in support of his argument that there were material omissions or misrepresentations concerning the development and creation of the Net Synergies. Despite never once mentioning the existence of an additional set of synergies

---

[8] Plaintiff also alleges that the Board's belief that the shareholders would benefit from the Net Synergies was misleading for "identical reasons." Am. Compl. ¶ 78. But because there are also no specific facts alleged that suggest the Board did not believe the shareholders would in fact benefit, that claim fails as well.

in the Amended Complaint, Plaintiff contends in his Opposition that the Proxy was false and misleading because it failed to disclose a "pre-existing set of material projections (the Bemis Net Synergies) that differ from those disclosed in the Proxy."  Opposition at 5.  Specifically, Plaintiff contends that the Proxy "failed to disclose the Bemis Net Synergy projections, despite such projections being included in at least the June 28 and July 18 Management Presentations and other Board materials reviewed at the July 6 and July 24 Board meetings," and also failed to disclose the "unreasonable basis for the Board ultimately endorsing the Net Synergy Projections and revising and abandoning the Bemis Net Synergy Projections."  *Id.* at 15.

Although Plaintiff cites the Amended Complaint when arguing that the Proxy failed to disclose the purported Bemis Net Synergy projections, Opposition at 8, 15 (citing Am. Compl. ¶¶ 8-9, 75-77), a close reading of the Amended Complaint reveals that it never mentioned the existence of those supposed other projections.  Even under a Rule 8 standard, it is well-settled that while a court "must assume that [a plaintiff] can prove the facts alleged in its amended complaint," it is "not, however, proper to assume that the [plaintiff] can prove facts that it has not alleged." *Twombly*, 550 U.S. at 588 n.8 (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 526 (1983)).  Additionally, the PSLRA makes clear that Plaintiff must, *in his complaint*, allege the specific facts that make the Proxy misleading, including the reasons why a particular statement is misleading.  *See* 15 U.S.C. § 78u-4(b)(1)(B).

Plaintiff plainly has not met Rule 8's minimum pleading standard, let alone the PSLRA's heightened pleading standard, with respect to his new arguments concerning a supposed prior set of synergies created by Bemis.  Initially, a plaintiff may not raise new facts in opposing dismissal and ask the Court to rely on those facts in determining whether he or she has stated a claim.  *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (noting that a plaintiff cannot

"amend" its pleading through its opposition papers); *In re China Mobile Games & Entm't Grp., Ltd Sec. Litig.*, No. 14 Civ. 4471 (KMW), 2016 WL 922711, at *5 n.9 (S.D.N.Y. Mar. 7, 2016) ("Plaintiffs, likely realizing the weaknesses in the Complaint, attempt to improperly plead new facts in their Opposition to the Motion to Dismiss. . . .  The Court does not consider these allegations because they were not part of the Complaint."); *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 445 n.100 (S.D.N.Y. 2005) ("[N]one of these new facts appear in the Complaint, which cannot be amended by the brief in opposition to a motion to dismiss.").  At oral argument, Plaintiff's counsel contended that allegations in the Amended Complaint regarding the Proxy's supposed failure to disclose certain "assumptions and methodologies" regarding the Net Synergies encompassed any arguments about the supposed Bemis Net Synergies.  12/8/20 Tr. at 59.  But general and vague allegations concerning the Proxy's supposed failure to disclose "the assumptions and methodologies" underlying a *disclosed* projection are not somehow sufficient to allege the Proxy's failure disclose *an entirely different projection* altogether.  In sum, under any standard, Plaintiff's complete failure to mention the Bemis Net Synergy projections at all in his Amended Complaint precludes him from relying on them now.[9]

Moreover, even the provisions of the Proxy cited in Plaintiff's Opposition do not support the inference that any Bemis Net Synergy projections existed.  *See* Opposition at 7-10; Proxy at 83-85.  The discussions in the Proxy of the June 28, 2018 and July 18, 2018 Board meetings did not mention "Bemis Net Synergies" at all or otherwise reveal that Bemis had its own synergies

---

[9] It should be noted that Plaintiff admits that he "does not challenge" the "accuracy" or "substance" of the Net Synergies, and that his "challenge is to the failure to disclose the Bemis' Net Synergies, and to the opinion claims that flow from this omission."  Opposition at 20.  But because Plaintiff has failed to allege even the existence of the Bemis' Net Synergies in his Amended Complaint, this statement alone arguably amounts to an admission that his Amended Complaint fails to state a claim.

projections.   Proxy at 83, 85.   Rather, those excerpts reported that Bemis and Amcor made "reciprocal management presentations regarding their respective businesses and potential synergy opportunities."  *Id.*  Indeed, Plaintiff's belated claim that there were certain Bemis Net Synergies presented during the June 28, 2018 meeting, *see* Opposition at 8, is in conflict with the allegation in the Amended Complaint that "Bemis management and Board did not even begin considering the value of [the net costs synergies in Amcor's three proposals] until July," Am. Compl. ¶ 77. Thus, Plaintiff's contention that it is "uncontroverted" that Bemis "created its own set of net synergy projections," Opposition at 3, is not supported by the Proxy.[10]

However, even assuming that the Bemis Net Synergy projections existed and had been adequately pleaded, Plaintiff would still fail to state a claim for substantially the same reasons stated above.  Again, Plaintiff simply relies on broad arguments regarding materiality to support his claim.  For instance, Plaintiff argues that "any" omission regarding any synergy predictions was material.   Opposition at 13-14.   But the existence of some additional, intermediary projection—if one even existed—does not automatically constitute a material fact, the omission of which makes a Proxy misleading.  *See Resnik*, 303 F.3d at 154 ("Disclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor."); *In re N. Telecom Ltd. Secs. Litig.*, 116 F. Supp. 2d 446, 458 (S.D.N.Y. 2000) ("The federal securities laws do not obligate companies to disclose their internal forecasts." (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997))); *cf. Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1163 (9th Cir. 2009) ("[T]here is no duty to disclose income projections in a prospectus.").   Here, Plaintiff does not make any specific allegations that the

---

[10] At oral argument, Defendants' counsel explicitly stated that no such Bemis Net Synergy projections existed.  12/8/20 Tr. at 38.  But the Court need not rely on this representation, since, as explained below, even if the projections did exist, Plaintiff still fails to state a claim.

purported Bemis Net Synergy projections were material, particularly in light of the four disclosed projections encompassing the Forecasts.

Instead, Plaintiff contends that there is "compelling factual evidence" in the Proxy that "the Bemis Net Synergy Projections . . . were likely of a lower magnitude" than those predicted by Amcor and "were revised upward when Bemis management endorsed the Net Synergy Projections a few days before execution" of the Transaction.  Opposition at 17.  But Plaintiff does not point to any facts supporting this contention—either in his Amended Complaint or in the Proxy itself.  *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . .").  Indeed, as discussed above, Plaintiff has not even alleged sufficient facts allowing a conclusion that the purported Bemis Net Synergy projections even existed.  *See Gray*, 454 F. Supp. 3d at 402  (rejecting the plaintiff's claim that a proxy was misleading for failing to disclose a financial advisor's opinion based on preliminary predictions because "there [wa]s no allegation" such an opinion existed and a company "cannot be faulted for failing to disclose a fact or analysis that did not exist"); *Golub v. Gigamon Inc*., 372 F. Supp. 3d 1033, 1052 (N.D. Cal. 2019) (rejecting a claim based on allegedly undisclosed projections where "[t]here [wa]s nothing to suggest that" those projections "were ever created").  Simply put, there is nothing in the Amended Complaint or in the Opposition that supports Plaintiff's guesswork.

What was disclosed in the Proxy, however, was sufficient to give shareholders the information necessary to making an informed vote on the Transaction.  *See Va. Bankshares, Inc.*, 501 U.S. at 1090.  As detailed above, the Proxy provided significant information about the assumptions underlying the Net Synergies and the other Forecasts.  Proxy at 104-05.  It provided detailed calculations showing how the Board arrived at those Forecasts.  *Id.* at 104-08.  It laid out the extensive due diligence that Bemis conducted in considering the Transaction as well as the

numerous meetings between Bemis and Amcor, during which they discussed potential synergies and jointly prepared the Net Synergies disclosed in that Proxy.  *Id.* at 83-85, 103.   It did all of this while cautioning shareholders not to overly rely on these Forecasts, as they were forward-looking projections that did not constitute fact.  *See, e.g.*, *id.* at 14, 104.  Plaintiff has not adequately pleaded any additional material facts that should have been disclosed, the absence of which made the Proxy false or misleading.

The cases that Plaintiff cites do not change this conclusion.  *See* Opposition at 15-16.   In each case, the plaintiffs adequately pleaded that the failure to disclose certain information made other information that *was* disclosed misleading.   For instance, in *Koppel v. 4987 Corporation*, 167 F.3d 125, 131 (2d Cir. 1999), the court found that the defendant misleadingly suggested that a report, which was designed to support the distribution of proceeds from a business sale, had taken into consideration the lessee's default, when in fact it had not done so.   In *Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1124-25 (8th Cir. 2019), the court found that the plaintiffs had stated a claim under Section 14(a) because defendants disseminated a proxy that disclosed gross profit but not net income.   The court found that the failure to disclose the latter, which was significantly less promising, made the gross profit figures potentially misleading.  *Id.*  In doing so, the court emphasized that "projected net income/loss is not trivial information" and "may be of more significance to investors than revenue," further noting that the court had previously "considered net income to be among the three most valuable figures in determining the fairness of an acquisition under the Clayton Act."  *Id.* at 1125.   And in *Karp v. First Connecticut Bancorp, Inc.*, No. 18 Civ. 2496 (RDB), 2019 WL 4643799, at *3-4 (D. Md. Sept. 24, 2019), the court found that the omission of future cash flows was potentially materially misleading in light of a proxy's disclosure of other material, financial information.

*Koppel*, *Campbell*, and *Karp* are thus each distinguishable.  Unlike in *Koppel*, Plaintiff does not allege that the Net Synergy projections disclosed in the Proxy gave the impression Defendants had or had not considered any specific information in making those projections.  In fact, even Plaintiff explicitly disclaims any challenge as to the Net Synergies' "accuracy" or "substance."  Opposition at 20.  And unlike in *Campbell* and *Karp*, Plaintiff fails to articulate any facts—that rise beyond pure speculation—as to how Defendants' failure to disclose the purported Bemis Net Synergies made the Net Synergies that *were* disclosed materially misleading.  Nor does Plaintiff adequately allege how the purported existence of the Bemis Net Synergy projections made the Board's stated beliefs in the disclosed Net Synergies any less true.

The main case Plaintiff cites in support—*Bumgarner v. Williams Companies, Inc.*, No. 16 Civ. 26 (GKF), 2016 WL 3162062 (N.D. Okla. June 3, 2016)—is clearly distinguishable.  In *Bumgarner*, the court addressed the plaintiff's claims that "four synergies projections" in the proxy were materially false and misleading.  As an initial matter, the court specifically noted that those projections "are immaterial—because they are forward-looking statements accompanied by adequate cautionary language."  *Id.* at *4.  It nonetheless found that the plaintiff had raised a Section 14(a) claim based on the allegation that the defendants represented in the proxy statement that the *reasons* certain projections changed were the "attribution of the synergies reduction to lower commodity prices, higher costs of capital, and infrastructure constraints," which gave "the clear implication," without cautionary language, "that several hundred million dollars in additional synergies will obtain—all else being equal—if market conditions return to the levels prevailing prior to the approval of the merger agreement."  *Id.*  Here, by contrast, Plaintiff does not allege that the Board misleadingly stated the reasons that any synergy projection changed, and in fact

argues, without sufficient supporting factual allegations, that certain projections were not disclosed at all.

Nor do any of the other cases cited by Plaintiff support his claim.  For instance, he points to *Baum v. Harman International Industries*, 408 F. Supp. 3d 70 (D. Conn. 2019) in support of his statement that "[n]umerous courts have found actionable statements of opinion under Section 14(a) based upon facts similar to those pled in the Complaint."  Opp. at 16.  But in *Baum* the court found actionable only one specific opinion statement regarding otherwise protected forward-looking projections: that a set of projections "contained greater downside risk than upside potential." *Baum*, 408 F. Supp. 3d at 86 & n.6.  Specifically, the court concluded that this opinion statement was actionable because it "offer[ed] a specific analysis of the risk reflected and justifie[d] the development and use of a new set of projections," which the court inferred were designed to mislead shareholders regarding the true outlook of a transaction.  *Id.* at 86 & n.6.  There are simply no analogous facts in Plaintiff's Amended Complaint or his Opposition.  Instead, the opinion statements that Plaintiff highlights in the Bemis Proxy were clearly forward-looking statements expressing a belief that the projections used were based on the best metrics available.  Such statements are not actionable.

Accordingly, there is nothing in Plaintiff's Amended Complaint—or his Opposition—that adequately alleges that the Board omitted information that made their opinion statements false or misleading.

     v.    *Plaintiff Fails to Allege that Goldman Did Not Disclose a Potential Conflict of Interest*

Although Plaintiff has abandoned this argument in his Opposition, *see* 12/8/20 Tr. at 66, the Amended Complaint alleges that the Proxy failed to disclose potential conflicts of interest of

37

Goldman, the Board's financial advisor, Am. Compl. ¶ 80; *see also id.* ¶ 13. For the sake of clarity and completeness, the Court notes that this allegation fails as well.

The Amended Complaint alleges that Goldman was incentivized to issue a favorable fairness opinion because it sought to "secure additional business in connection with divestitures necessary to secure regulatory approval for the Transaction" vis-à-vis any antitrust concerns. *Id.* ¶¶ 13, 81. The Amended Complaint specifies that the Proxy allegedly failed to disclose: (1) "when Bemis approved Goldman's Merchant Banking Division, or funds, investment vehicles or other entities managed, sponsored or advised by Goldman's Merchant Banking Division or in which it may have economic interests, participating in any sale process with respect to the businesses that Amcor and/or Bemis might be required to divest in connection with obtaining regulatory approval for the Proposed Transaction, including potentially bidding on and purchasing one or more of such businesses;" and (2) "the specific content and nature of the discussions Goldman had with Bemis regarding its potential participation in any sale process with respect to businesses Amcor and/or Bemis might be required to divest, including with respect to potentially bidding on and purchasing one or more of such businesses." *Id.* ¶¶ 14, 82. Therefore, Plaintiff contends that Bemis provided its stockholders with an "incomplete picture" of Goldman's conflicts. *Id.* ¶ 14.

These allegations, however, are refuted by the conflict disclosure language contained in the Proxy. Proxy at 102. As Plaintiff himself acknowledges in the Amended Complaint, the Proxy revealed that Goldman may have an economic interest in any sale process that may need to be divested. Am. Compl. ¶¶ 13, 81. Specifically, the Proxy stated that Amcor or Bemis "in connection with obtaining regulatory approval for the transaction, . . . may be required to divest one or more of their respective businesses" and that Goldman or a related division "in which it may have economic interests may participate in any sale process with respect to such businesses,

including potentially bidding on and purchasing one or more of such businesses."  Proxy at 102; *accord* Am. Compl. ¶¶ 13, 81 (quoting disclosure).

It therefore is clear that the Proxy provided significant, comprehensive disclosure of the potential conflicts of interest that Goldman faced.  The requirement that a company disclose potential conflicts of interest is designed to warn "stockholders to give more careful scrutiny to the terms of the merger than they might to one recommended by an entirely disinterested" party. *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 384 n.6 (1970).  Thus, while "full disclosure of potential conflicts of interest" is required, *Wilson*, 855 F.2d at 994, the Proxy did just that when it disclosed Goldman's potential conflict.  The shareholders here were on notice of that potential conflict of interest and what it entailed, and Plaintiff fails to allege how any additional disclosures were required.[11]

## C.  Section 20(a) Claim

To plead a Section 20(a) claim, a plaintiff must allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI Commc'ns, Inc.*, 493 F.3d at 108).  A court may dismiss a claim under Section 20(a) if it finds that a plaintiff's Section 14(a) claim warrants dismissal.  *See, e.g.*, *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 n.2 (2d Cir. 1993) (noting that "Section 20 merely creates a derivative

---

[11] Defendants also argue for dismissal on the ground that Plaintiff fails to plead loss causation, but instead relies upon insufficient, conclusory allegations of damages lacking specificity.  Because the Court grants the Motion to Dismiss the Amended Complaint on other grounds, it does not reach the question of whether Plaintiff has adequately alleged loss causation.

liability for violations of other sections of the Act").  Because the Court finds that Plaintiff fails to plead an underlying Section 14(a) violation, his Section 20(a) claim also fails.

### III.  Conclusion

Accordingly, for the reasons stated above, it is hereby ORDERED that Defendants' Motion to Dismiss is granted and this case is dismissed with prejudice.  The Clerk of the Court is respectfully directed to terminate the motion at Docket Number 22 and close this case.

SO ORDERED.

Dated: January 12, 2021
      New York, New York
                                           JOHN P. CRONAN
                                    United States District Judge